935 A.2d 468

**Carroll Antonio HATCHER**

v.

**STATE of Maryland.**

**No. 1055 Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Nov. 7, 2007.

362

Katherine P. Rasin (Sarah Thorpe, Nancy S. Forster, Public Defender, on the brief), Baltimore, for Appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: DAVIS, JAMES R. EYLER and MEREDITH, JJ.

JAMES R. EYLER, Judge.

Carroll Antonio Hatcher, appellant, was charged in the Circuit Court for Washington County with possession of cocaine and possession of cocaine with intent to distribute. Before trial, appellant filed a motion to suppress cocaine seized from his pants pocket. Following a suppression hearing, the court denied appellant's motion, and appellant was convicted by a jury of possession of cocaine with intent to distribute. Subsequently, appellant was sentenced to fifteen years' imprisonment, with all but 84 months suspended, and three years of unsupervised probation upon release. Appellant's sole contention on appeal is that the court's denial of his motion to suppress was in error. We shall affirm.

Appellant was a passenger in a vehicle stopped by police officers. The officers observed the driver of the vehicle run a red light and drive at an excessive speed, and they knew the vehicle had been stolen, prior to initiating the stop. The basis for our conclusion is that the arresting police officers had probable cause to arrest appellant and conduct a search

incident to that arrest and, alternatively, that the cocaine would have been inevitably discovered.

## Factual Background

On April 25, 2006, a suppression hearing was held pursuant to appellant's motion to suppress cocaine seized from his person during an illegal search. At that hearing, Officer Thomas Kelley testified as follows.

On December 15, 2005, at approximately 12:41 a.m., Officer Kelley and Officer Tom Niebauer of the Hagerstown Police Department, were stopped at a traffic light at the intersection of "North Jonathan and Franklin," when they observed a black Chevy run a red light on Franklin Street. At that time, Officer Kelley began to follow the vehicle, which was traveling at approximately 45 miles per hour in a zone with a posted speed limit of 25 miles per hour. The officers ran the vehicle registration through police dispatch and learned that the vehicle had been stolen in Leesburg, Virginia. Subsequently, the officers initiated a traffic stop by activating the police vehicle's lights and siren. The vehicle continued traveling approximately "a quarter of a mile to a half mile," however, and proceeded to a ramp onto southbound Interstate 81 before it stopped "just off the . . . ramp."

Once the vehicle stopped, the officers conducted a "high-risk stop" based on the fact that the vehicle was reported stolen and initially failed to comply when the officers attempted to stop it. Officer Kelley testified that the high-risk stop consisted of giving verbal commands to the driver, with weapons drawn, to turn off the vehicle, remove the keys from the ignition, and drop the keys outside of the vehicle. The officers then advised the driver to exit the vehicle. The driver complied with the officers' request, and he was handcuffed and removed to a safe location where he was detained.

Officer Kelley stated that the front seat passenger, a female, was then commanded to exit the vehicle, was handcuffed, and removed to a safe location, where she was detained. The last occupant of the vehicle, appellant, who had

been sitting in the rear, on the driver's side of the vehicle, was then commanded to exit the vehicle, was handcuffed, and removed to a safe location, where he was detained. Officer Kelley testified that, as each occupant was removed from the vehicle, "[d]uring each time of the handcuffing, as they were being removed to a safe location, a quick pat down was conducted for any possible weapons."

Officer Kelley testified that after confirming that the vehicle had been stolen and determining that all of the occupants were going to be placed under arrest for the vehicle theft, but prior to placing appellant in the rear of his police cruiser, he "searched" appellant. Officer Kelley's testimony in this regard was as follows.

THE STATE: And now proceeding on with what happened that evening, did there come a time when you patted down [appellant], the rear seat passenger?

OFFICER KELLEY: Yes. After the vehicle had been cleared for any possible or any additional suspects, I then went back, made contact with [appellant]. He was in a safe location. I u'm prior to placing him in the back of my police cruiser, once again searched him.

THE STATE: Let me ask you, at that point was it your intent at that point to place him in the back of the police cruiser before you patted him down?

OFFICER KELLEY: Yes to get—due to the—Believe it or not at that time of night 81 was very congested, a lot of traffic. It was determined, based on the information that we had, it was confirmed that the vehicle was stolen, that all suspects were to be placed under arrest and also to bring [appellant] to a safe location out of the flow of traffic or to at least get him off the uh in a vehicle, my determination was to place him in the back of the vehicle for his safety.

THE STATE: Okay. And Officer Kelley, let me—I just want to clarify some things. Do you have your reports in front of you?

OFFICER KELLEY: Yes.

THE STATE: Okay and this—just to make sure we get a good chronology for the [c]ourt, at the time that you were going to conduct the pat down—

OFFICER KELLEY: Yes.

THE STATE: Okay you placed [appellant] in handcuffs at that point is that correct? Before patting him down?

OFFICER KELLEY: He had already—Excuse me. [Appellant] had already been in handcuffs at that time, yes. And another officer had already patted him down.

THE STATE: Okay so another officer had patted him down. Was anything found at that point that you know of?

OFFICER KELLEY: Not that I know of, no sir.

THE STATE: So at what point was it that you sear—that you conducted any further search of [appellant]?

OFFICER KELLEY: Prior to placing him in the back of the vehicle, which each day I sign out that vehicle, I am responsible for that vehicle, any contents of that vehicle I am responsible for. So before each—At the beginning of each shift, at the end of each shift, I search the interior compartment of that vehicle, be it the passenger compartment, under the driver and passenger side seats. I search that. Anyone that is taken into custody, be it myself or another officer makes an arrest and I'm required to transport, I search that person the best I can to uphold the integrity of my search of the compartment of that vehicle. . . . But to uphold the integrity of the original or the initial search, anybody that is put in the vehicle is searched by myself.

THE STATE: And prior to conducting that search that we're talking about and will describe for the [c]ourt in a second here, was it your intent to place [appellant] under arrest on the car issue, the car theft issue?

OFFICER KELLEY: Yes.

THE STATE: Okay. And what did you do then—Could you please explain to the [c]ourt what type of search you conducted and what you found if anything?

OFFICER KELLEY: I searched the outer area of [appellant]. I then proceeded to check his pockets. And then as I checked his right front pocket, I felt an object that was hard, a hard cylinder object that was consistent, based on initial feeling of it, with the size of an item that I believed to be possibly a or consistent to be with a crack cocaine pipe. I proceeded further, removed the item from his pocket. It was wrapped in a piece of cloth with a rubber band wrapped around it. I removed the rubber band, the cloth and there was a glass pipe with wire mesh on one end. The contents of that wire mesh had burnt residue. And through my training, knowledge and experience, I suspected that the item was used to smoke crack cocaine and that the residue was possibly crack cocaine in the burnt—in the mesh. In addition in the same area a small plastic zip-lock baggie contained a white or beige rocklike substance. Also through my training, knowledge and experience I initially suspected the item to be, recognized the item to be, suspected to be crack cocaine.

I maintained custody of those items, continued with the search and then placed [appellant] in the back of the car. Now the search was not an extensive search. It was just the, like you could say the personal compartments of [appellant] which consisted of pockets, the belt lining and again the belt lining for any possible hidden weapons or contrabands that may have been missed and then I rubbed down the legs and sock area.

On cross-examination, Officer Kelley testified that, although he had information that the vehicle was stolen, he had not received information prior to the stop that appellant was wanted for the theft. As the officers were in the "process of leaving" the scene, the police dispatcher advised that "Carroll Antonio Hatcher" was wanted for the theft, in Leesburg, Virginia. At that time, Officer Kelley was still trying to determine if appellant was Carroll Antonio Hatcher because he had identified himself as "Randolph T. Hatcher," and presented a New Jersey identification card so indicating. At

some point, Officer Kelley also learned that there was a warrant for the driver of the vehicle, Dewaine Feaster.

As noted earlier, Officer Kelley testified that a "pat-down" had occurred prior to his search of appellant. On cross examination, Officer Kelley testified that he "assumed" a "pat-down" had occurred prior to his search. The pertinent testimony follows.

APPELLANT'S COUNSEL: Officer Kelley, who was driving the vehicle in question?

OFFICER KELLEY: A black male who was later identified as Dewaine ... Feaster....

APPELLANT'S COUNSEL: And the record would indicate that there were some New Jersey warrants for both Mr. Feaster and—

OFFICER KELLEY: U'm—I believe there were warrants for both Mr. Feaster and—

* * *

OFFICER KELLEY: Yes in Essex County.

APPELLANT'S COUNSEL: When would you have been aware of those?

OFFICER KELLEY: We were advised during the booking process.

APPELLANT'S COUNSEL: During booking?

OFFICER KELLEY: Yes.

APPELLANT'S COUNSEL: The uh—When dispatch said—I believe you said right around the time you started the traffic stop, dispatch said the vehicle was stolen. What exactly—Not that you know verbatim, but what would be— How would they—What would they have told you? What would dispatch say?

OFFICER KELLEY: Something along the lines that the vehicle was 1099, indicated wanted.

APPELLANT'S COUNSEL: Okay.

OFFICER KELLEY: And then they would further give information indicating it was wanted out of Leesburg, Virginia for being stolen.

APPELLANT'S COUNSEL: Your answer is that basically the information that you and Officer Niebauer had?

* * *

OFFICER KELLEY: I'd say yeah. I mean that's the gist of it yes.

APPELLANT'S COUNSEL: Okay. What I'm getting at is dispatch said the vehicle is reported stolen out of Virginia, Leesburg, Virginia. It's report—It's a stolen vehicle out of Virginia.

OFFICER KELLEY: Yes.

APPELLANT'S COUNSEL: Okay. There would be no specific information at that time indicating [appellant] to you. It wouldn't say anything—"We're looking for Carroll Hatcher" at the same time.

OFFICER KELLEY: At the initial time?

APPELLANT'S COUNSEL: Right.

OFFICER KELLEY: No. Prior to the stop, no.

APPELLANT'S COUNSEL: And is it fair to assume, based on your answer about the driver, that when you went to booking, you would have found out more information about the various people, including [appellant]?

OFFICER KELLEY: If I can elaborate. As the investigation continued with the stop, the arresting of all the occupants, of course police dispatch getting information fairly quickly on the computer screen, they would then—they then gave information indicating that a u'm Carroll Hatcher was to be associated with the vehicle and was also wanted out of Leesburg, Virginia for the uh for the theft of the vehicle.

APPELLANT'S COUNSEL: Do you know exactly when you would have got that information? If you don't, you don't.

OFFICER KELLEY: No I don't know sir.

APPELLANT'S COUNSEL: Okay.

THE COURT: Well you said dispatch would have given you that information fairly quickly?

OFFICER KELLEY: Well if I—They are receiving the information fairly quickly. Of course while the traffic stop is in progress, they cease all radio traffic to free up the air. So they indicate the vehicle is stolen out of Leesburg, Virginia. We are in the course of making the traffic stop, the vehicle stopping, et cetera. They free up traffic on the radio we then conduct our stop procedure. We detain or we detain the occupants. The determination is made at that time, based on the fact that the vehicle is stolen, the occupants are under arrest. Each occupant is detained in their separate areas. And then as I think prior or up to prior to transportation, transporting back to the police department, they are indicating that [appellant] is to be wanted for the theft of the vehicle ...

THE COURT: Well do you know how long you were on the scene from the time of the stop until vacating the scene?

OFFICER KELLEY: I can estimate at approximately 12:41 we initiated the, we made the stop approximately and approximately 12:43 we advised police dispatch that the occupants were under arrest. And I'd say maybe 10 to 15 minutes or so, again trying to figure out what we were going to do about towing the vehicle, inventorying the vehicle, and trying to get these, the suspects back to the building as quickly as possible, get off 81.

THE COURT: Okay. But as I understood it from [appellant's counsels'] question, you had information that a Carroll Hatcher was wanted out of Leesburg, Virginia for theft of the vehicle for theft of the vehicle before you vacated the I–81 scene?

* * *

OFFICER KELLEY: We were in the process of leaving when police dispatch had advised that he was wanted.

* * *

APPELLANT'S COUNSEL: Okay. Is it fair to say that each person, starting with the driver, would have been, would have been told to, if I can get this right, "Put your

hands out the window[,]"[] "Hands up and walk backwards[?]"[ ]

OFFICER KELLEY: Yes.

* * *

APPELLANT'S COUNSEL: At some point "Get on the ground[?]"[ ]

OFFICER KELLEY: Yes.

APPELLANT'S COUNSEL: And then they are handcuffed.

OFFICER KELLEY: Yes.

* * *

APPELLANT'S COUNSEL: Okay and then—Now if my client describes being walked back to one of the cruisers and leaning over the trunk of the cruiser to be searched, is that a fair statement? You know that he was brought back to one of the police cars, leaned over the cruiser in order to be searched?

OFFICER KELLEY: I would speculate because I did not have uh visual on [appellant] when he was completely brought back for any searching. My vision or my attention was on the vehicle until the vehicle had been cleared.

APPELLANT'S COUNSEL: I thought in response to one of [the State's] questions … I thought you said he had already been, [appellant] had already been patted down by somebody else? Is that—Am I correct in that?

OFFICER KELLEY: Yes.

APPELLANT'S COUNSEL: All right. And would that have been officer Niebauer?

OFFICER KELLEY: That I don't know.

APPELLANT'S COUNSEL: So there were other cruisers because there were a number of police cars there, I take it.

OFFICER KELLEY; Yeah and it was myself and Officer Niebauer in a two person car and I believe there were two additional HPD who responded.

APPELLANT'S COUNSEL: So in fact to your knowledge today someone else from HPD patted down [appellant] and

then you did the more extensive search and felt the object in his pocket?

OFFICER KELLEY: Yes.

* * *

APPELLANT'S COUNSEL: Okay. Some other officer patted down [appellant]. You then place him in the cruiser or do you search him first?

OFFICER KELLEY: I search him before I place him in the cruiser.

APPELLANT'S COUNSEL: At what point is [appellant] officially told he's under arrest? And if you don't remember, that'[s] fine.

OFFICER KELLEY: I don't remember.

APPELLANT'S COUNSEL: And I think in response to the [c]ourt's question, as you were leaving, you received info—as you were leaving the scene I assume with [appellant] in the cruiser, you got word from dispatch that he was specifically wanted out of Virginia.

OFFICER KELLEY: We got information that a Carroll Antonio Hatcher was wanted out of Leesburg, Virginia for the theft of the vehicle, however, we were still trying to—

APPELLANT'S COUNSEL: Figure out if this was Carroll Hatcher.

OFFICER KELLEY: Figure out if this was Carroll Hatcher or not because he identified himself to be Randolph T. Hatcher and he presented a New Jersey identification card. So there was—

APPELLANT'S COUNSEL: For timing purposes, it's your best recollection you were leaving the scene when that information came in.

OFFICER KELLEY: Yes I would anticipate that, yes.

APPELLANT'S COUNSEL: Okay now in your police report, in your report, you indicate that each suspect would be handcuffed and searched for possible weapons. But you do use the word "searched[.]"[ ] However in response to my question it's your recollection that another officer patted

down [appellant], a pat down for weapons. Outer clothing. Or you don't know? I mean you don't know what they did.

OFFICER KELLEY: Me using search in that incident was a loose word.

APPELLANT'S COUNSEL: Okay.

OFFICER KELLEY: It should have been better articulated as a pat down to articulate the high-risk stop. But in reference to your question about what another officer did, I can't answer that.

APPELLANT'S COUNSEL: But you seem to have some understanding that somebody had processed him first.

OFFICER KELLEY: I would assume that when he was cuffed, brought back to a safe location, that a pat down would have been conducted for weapons.

APPELLANT'S COUNSEL: Okay.

OFFICER KELLEY: And again search was a loose term. I should have articulated that better.

* * *

THE STATE (Redirect Examination): Officer Kelley, do you have any recollection of being advised prior to your search of [appellant] that anything had been identified, located or recovered of an illicit nature by whoever conducted the pat down? Did anyone tell you they found something on him before you searched him?

OFFICER KELLEY: No sir nobody told me that. No sir.

THE STATE: Okay. And you indicated that you had contacted the police department indicated that the occupants were placed under arrest at 12:43?

OFFICER KELLEY: The arrest—The booking sheet indicates that they were informed at 12:43 is what was noted in the system.

THE STATE: And was—Had you decided or had the decision [been] made to arrest [appellant] prior to your searching him?

OFFICER KELLEY: Yes my decision had been made prior to searching.

Appellant also testified at the hearing. He testified that he was seated in the rear passenger seat when the vehicle was stopped. He stated that after the driver was ordered out of the vehicle, he was ordered to exit the vehicle with his hands in the air, walk backwards towards the officers, drop to the ground on his knees, lock his legs, and interlock his hands behind his head. At that point, appellant stated that he was placed in handcuffs. As to the conduct of the search, appellant testified as follows.

APPELLANT'S COUNSEL: Then what happened next?

APPELLANT: I was standing beside the driver. Both of us had, was being searched.

APPELLANT'S COUNSEL: Were you standing straight up?

APPELLANT: I was leaned over the [police] car.

APPELLANT'S COUNSEL: Okay. Did you—Did the officer, the first officer, did you feel him pat you down? How did the—What happened?

APPELLANT: Actually it wasn't but one officer that patted me down. They searched me.

APPELLANT'S COUNSEL: How many officers was it?

APPELLANT: There were several officers there I observed, but it was only one officer that searched me.

\* \* \*

APPELLANT'S COUNSEL: Now there is—There is something called a pat down where your clothing is patted down to feel things and then there is reaching into your pocket and so forth.

APPELLANT: Well the way I was searched it wasn't, it was more than just a pat down. I mean when I was being searched, hands was going in my pockets. It wasn't like rubbing me you know. Hands was going in my pockets, checking all my pockets.

APPELLANT'S COUNSEL: Was anything taken out of them?

APPELLANT: Yes a crack pipe and a zip-lock baggie with a piece of crack in it.

THE COURT: All right I'm confused. I thought Officer Kelley did that at a later time.

APPELLANT: That was the only time that I was searched.

THE COURT: Only one time.

APPELLANT: Right.

THE COURT: And that is Officer Kelley.

APPELLANT: Yes sir.

THE COURT: Okay.

APPELLANT'S COUNSEL: After you were searched, were you placed in a cruiser?

APPELLANT: Yes I was.

APPELLANT'S COUNSEL: Okay. Did there come a time when you were told that you were under arrest?

APPELLANT: Once I was seated in the cruiser.

APPELLANT'S COUNSEL: And it was said you were under arrest.

APPELLANT: Right.

\* \* \*

APPELLANT'S COUNSEL: Did there come a time when you were told that there was a warrant for you out of Virginia?

APPELLANT: No not until I got to the station.

APPELLANT'S COUNSEL: That's my question. When you were told there was a warrant for you out of Virginia?

APPELLANT: While I was at the station being finger-printed and ready for picture.

On June 13, 2006, the court issued a bench ruling on appellant's motion to suppress. In denying appellant's motion, the court ruled as follows, in pertinent part.

The law and its application. The issue articulated by counsel at the suppression hearing was whether Officer Kelley had probable cause to arrest the [appellant] as an occupant of the vehicle. Prior to initiating the stop, Officer Kelley

had knowledge that the vehicle was stolen. It is important to remember that, quote, "The rule of probable cause is a nontechnical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction by more evidence than that which would arouse a mere suspicion," end quote. *Doering versus State,* 313 Md. 384 at page 403[, 545 A.2d 1281]. As further noted by the *Doering* Court, "These are not technical. They are factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act." 313 Md. at page 403[, 545 A.2d 1281].

With this legal predicate, it is necessary to examine the crime for which Officer Kelley may have had probable cause to make an arrest. Section 7–105(b) of the Criminal Law Article prescribes the following conduct. "A person may not knowingly and willfully take a motor vehicle out of the owner's lawful custody, control or use without the owner's consent." A violation of this subsection is a felony. Section 14–102 of the Transportation Article proscribes the unauthorized use of a motor vehicle. Unlike motor vehicle theft, this latter section does not require proof of the intent to steal the vehicle to sustain a conviction. As noted in *Johnson v. State,* 2 Md.App. 486, [236 A.2d 41 (]1967[)] case, the scope of the crime of unauthorized use was delineated in *Anello v. State,* 201 Md. 164 at page 167[, 93 A.2d 71]. And the following is a quote from A[n]ello and Johnson. "In Maryland it is a misdemeanor for any person, his aiders or abettors, to take and carry away out of the custody or use of any other person any of the enumerated kinds of property, including motor vehicles, although it may appear from the evidence that the offender, his aiders and abettors, took and carried away the property for his or their present use and not with the intent of appropriating or converting the same." The Court of Special Appeals in *Johnson* concluded "Thus, in order to convict for larceny of use it is not essential to prove that the accused took the property from the owner. Participation, alone, in the continued use of the vehicle by a passenger with the requisite criminal intent is

sufficient to sustain a conviction. In the case at bar, there is no question that the car was stolen and that Johnson, as a passenger therein at the time of his arrest, was participating in its use to the deprivation of the owner. There remains only to determine whether there was legally sufficient evidence of Johnson's criminal intent or guilty knowledge." And that's the end of that quote from *Johnson v. State.*

Of course the *Johnson* Court was examining the sufficiency of the evidence to sustain a conviction for unauthorized use. As noted previously, the instant case involves the much less stringent standard of probable cause. Using the non-technical rules enunciated in the appellate cases, the [c]ourt believes that Officer Kelley had probable cause to arrest the [appellant]. Although Officer Kelley could not know the [appellant's] intent, he reasonably knew that the [appellant], as a passenger, was participating in the use of a stolen vehicle. The U.S. Supreme Court noted in *Pringle* that occupants of a motor vehicle are likely to be involved in a common enterprise. Having verified that the vehicle in this case was stolen, it was reasonable for Officer Kelley to conclude that the [appellant] was a participant in the theft and/or unauthorized use, hence the search of the right front pants pocket of the [appellant] is a permissible search incident to arrest.

Assuming arguendo that probable cause did not exist for an arrest, it appears that Officer Kelley had the right to detain the [appellant] at least for a brief period of time while the investigation was developing. See generally *Watkins v. State,* 288 Md. [597] 596, [420 A.2d 270] a 1980 case. See also *U.S. v. Wright,* 565 F.2d 486, a 1977 case out of the 8th Circuit Court of Appeals, certiorari denied 435 U.S. 974, [98 S.Ct. 1621, 56 L.Ed.2d 67 (]1978[)]. After the stop of the vehicle took place, the officer was at least entitled to obtain basic identifying information from the occupants of the car. Handcuffing alone does not necessarily transform an investigatory stop into an arrest. *Trott v. State,* 138 Md.App. 89, 770 A.2d 1045, a 2001 case. Within approximately 10 min-

utes of the stop, Officer Kelley was given information that a Carroll Antonio Hatcher was wanted in Leesburg, Virginia. Under the circumstances of this case, it was reasonable for Officer Kelley to detain the [appellant] for a brief period of time, including transporting him to the station pending resolution of the [appellant's] identity.

When the [appellant] was then identified as Carroll Hatcher, the investigatory detention ripened to probable cause to arrest the [appellant], hence the pipe and cocaine would have been inevitably discovered pursuant to lawful search incident to the [appellant's] arrest under such a scenario. For these reasons, the [appellant's] motion to suppress is denied.

## Parties' Contentions

We shall paraphrase the parties' contentions.

Appellant contends that the motions court erred in denying appellant's motion to suppress because (1) appellant was arrested solely because of his status as a passenger in the car and without any individualized suspicion or probable cause to believe that he was committing any crime, and (2) appellant was clearly arrested, rather than simply detained for investigatory purposes; thus, Officer Kelley did not intend to conduct a *Terry*[1] stop and, in any event, did not "articulate any basis for having any suspicion specific to appellant to do so"; and, (3) there was no basis for reasonable articulable suspicion to justify detaining appellant, within the meaning of *Terry*.

The State counters that (1) Officer Kelley clearly had probable cause to arrest appellant for unauthorized use of a motor vehicle based on the totality of the circumstances surrounding the stop—which circumstances included that appellant was a passenger in a stolen vehicle that, at 12:41 a.m., had run a red light, was speeding, and had failed to immediately stop after the officers activated their emergency lights—and to properly conduct a search incident to that arrest; (2)

---

1. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

assuming arguendo, the police did not have probable cause to arrest appellant, the fact that police ordered him out of the vehicle at gunpoint and handcuffed him did not mean that appellant was arrested, and the actions constituted an allowable investigatory detention pursuant to *Terry;* and, (3) that, pursuant to the inevitable discovery doctrine, even if the police had neither probable cause to arrest, nor reasonable suspicion to conduct an investigative detention, "any taint from an illegal search and seizure would have been dissipated by the subsequent discovery that [appellant] was wanted by Virginia authorities for theft of the vehicle"; thus, the evidence recovered was admissible as the fruit of a search incident to a lawful arrest.

## Discussion

### A. Standard of Review

When reviewing a circuit court's denial of a motion to suppress, our scope is ordinarily limited to the record of the suppression hearing and does not include the record of the trial. *Myers v. State,* 395 Md. 261, 274, 909 A.2d 1048 (2006) (*citing Byndloss v. State,* 391 Md. 462, 477, 893 A.2d 1119 (2006)). We consider the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the party prevailing on the motion, in this case, the State. *State v. Nieves,* 383 Md. 573, 581, 861 A.2d 62 (2004). Ordinarily, we will give great deference to a hearing judge's factual findings, and we will not disturb them unless they are clearly erroneous. *Id.* at 581–82, 861 A.2d 62. When reviewing the denial of a motion to suppress evidence under the Fourth Amendment, however, we must, under an independent *de novo* review standard, consider the application of the law to the facts in determining whether the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed. *Longshore v. State,* 399 Md. 486, 499, 924 A.2d 1129 (2007) (other citations omitted). "Indeed, appellate courts make their 'own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of

the particular case.' " *Id.* (*quoting Jones v. State,* 343 Md. 448, 457, 682 A.2d 248 (1996)).

## B. Motion to Suppress

Before turning to the merits, we shall summarize the facts adduced at the suppression hearing that are pertinent for purposes of our analysis.

At approximately 12:41 a.m., Officer Kelley and Officer Niebauer initiated a traffic stop of the vehicle based on the knowledge that it was stolen, was in violation of traffic laws, and had failed to respond promptly. Subsequently, the vehicle's occupants were ordered out of the vehicle, possibly patted down, and physically restrained. An intent to arrest the vehicle's occupants was formed at some point, but prior to the search of appellant. At 12:43, the officers announced to the police dispatcher the arrest of appellant and the other occupants. Thereafter, and prior to putting appellant in the back of the police cruiser, appellant was searched. According to the court's finding, the stop, at the scene, lasted approximately 10 minutes. As they were leaving the scene, the officers learned of the existence of an outstanding warrant for Carroll Antonio Hatcher, who was wanted out of Leesburg, Virginia for the theft of the vehicle. At that time, the officers were attempting to verify that appellant was Carroll Antonio Hatcher.

For the reasons that follow, we shall conclude that appellant was lawfully arrested based on probable cause and, subsequently, searched incident thereto. Even if we did not so conclude, and instead assumed hypothetically that the arrest and search were unlawful, we would conclude that there was reasonable articulable suspicion to support a *Terry* stop, and that the drugs would have been inevitably discovered.

### 1. Fourth Amendment; Probable Cause and Search Incident to Arrest

The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth

Amendment, protects against unreasonable searches and seizures. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Warrantless searches and seizures are considered *"per se* unreasonable," *In re Tariq A–R–Y*, 347 Md. 484, 490, 701 A.2d 691 (1997), but, if such a search or seizure "falls within one of a carefully defined set of exceptions, it will be upheld." *Id.*; *see Gamble v. State*, 318 Md. 120, 123, 567 A.2d 95 (1989). A search incident to a lawful arrest, based upon probable cause, *see State v. Wallace*, 372 Md. 137, 147, 812 A.2d 291 (2002), "is one of the well delineated exceptions to the warrant requirement." *State v. Nieves*, 383 Md. 573, 583, 861 A.2d 62 (2004) (other citations omitted). Furthermore, pursuant to Maryland Code (2001), § 2–202 of the Criminal Procedure Article, a police officer "without a warrant may arrest a person if the police officer has probable cause to believe that a felony has been committed or attempted and the person has committed or attempted to commit the felony whether or not in the presence or within the view of the police officer."

In *Collins v. State*, 322 Md. 675, 589 A.2d 479 (1991), the Court of Appeals explained probable cause as follows.

Probable cause, we have frequently stated, is a nontechnical conception of a reasonable ground for belief of guilt. *Doering v. State*, 313 Md. 384, 403, 545 A.2d 1281 (1988); *Edwardsen v. State*, 243 Md. 131, 136, 220 A.2d 547 (1966). A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion. *Woods* [*v. State*, 315 Md. 591, 611, 556 A.2d 236 (1989)]; *Sterling v. State*, 248 Md. 240, 245, 235 A.2d 711 (1967); *Edwardsen, supra*, 243 Md. at 136, 220 A.2d 547. Our determination of whether probable cause exists requires a nontechnical, common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge. *State v. Lemmon*, 318 Md. 365, 379, 568 A.2d 48 (1990); *Doering, supra*, 313 Md. at 403–04, 545 A.2d 1281. Probable cause exists where the facts and circumstances taken as a whole would lead a reasonably cautious person to

believe that a felony had been or is being committed by the person arrested. *Woods, supra,* 315 Md. at 611, 556 A.2d 236; *Stevenson v. State,* 287 Md. 504, 521, 413 A.2d 1340 (1980); *Duffy v. State,* 243 Md. 425, 221 A.2d 653 (1966). Therefore, to justify a warrantless arrest the police must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion. *Lemmon, supra,* 318 Md. at 380, 568 A.2d 48.

*Id.* at 680, 589 A.2d 479 (parallel citations omitted).

The above-quoted principles remind us to remember "precisely what it is that we are measuring," *Burns v. State,* 149 Md.App. 526, 539, 817 A.2d 885 (2003), when analyzing the adequacy of the basis for a probable cause determination. *Id.* As we stated in *Burns,*

on this threshold issue of probable cause, a lot less need be shown [than need be shown to support a guilty verdict]. We are, after all, not measuring the level of certitude that must exist for a defendant to be deprived of freedom. We are only measuring the reasonableness of a non-lawyer police officer's on-the-street reaction to a rapidly unfolding confrontation. We must never forget the critical difference between these two very different measurements.

*Id.* at 540, 817 A.2d 885.

Once a person has been lawfully arrested based on probable cause, the police may conduct a search incident to that arrest. In *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court explained the justification for such a search.

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'-construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

*Id.* at 762–63, 89 S.Ct. 2034.

■ Appellant argues that the fact that he "was a back-seat passenger in a car that had been reported stolen could not, alone, confer probable cause to believe that [he], rather than the driver, had committed or was committing a crime," that crime being, as indicated by the motions court, either motor vehicle theft pursuant to Maryland Code (2002), § 7–105(b) of the Criminal Law Article,[2] unauthorized removal of a motor vehicle pursuant to Maryland Code (2002), § 7–203 [3] of the Criminal Law Article, or use of a vehicle without the owner's consent pursuant to Maryland Code (2001 Repl.Vol.), § 14–102 of the Transportation Article.[4] We disagree.

---

**2.** That section provides, "[a] person may not knowingly and willfully take a motor vehicle out of the owner's lawful custody, control, or use without the owner's consent."

**3.** § 7–203, which was formerly codified at Maryland Code, Article 27, § 349, provides, in part,

(a) Without the permission of the owner, a person may not . . . take and carry away from the premises or out of the custody or use of the other . . . any property, including: (2) a motor vehicle. . . .

**4.** That section provides, in part,

(a) A person may not drive any vehicle without the consent of its owner and with intent to deprive the owner temporarily of his possession of the vehicle, even if without intent to steal it.

(b) A person may not take a vehicle without the consent of the owner of the vehicle and with the intent to deprive the owner temporarily of the owner's possession of the vehicle, even if without the intent to steal the vehicle.

In *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), a car occupied by three men was stopped by police at 3:16 a.m. for speeding. After the driver consented to a search of the vehicle, the police found a large quantity of cash in the glove compartment and baggies containing cocaine behind the back-seat armrest. None of the individuals in the vehicle admitted to ownership of the drugs or money, and they were all arrested on possession charges. Pringle, the front-seat passenger in the vehicle, later admitted during questioning at the police station that the drugs and money belonged to him, and a pre-trial motion to suppress his confession as the fruit of an illegal arrest was later denied. Subsequently, Pringle was convicted of possession with intent to distribute cocaine and possession of cocaine.

After decisions by this Court, 141 Md.App. 292, 785 A.2d 790 (2001), and the Court of Appeals, 370 Md. 525, 805 A.2d 1016 (2002), the Supreme Court granted certiorari. The defendant acknowledged that the officers had probable cause to believe that a felony had been committed upon recovering the cocaine from the vehicle, therefore, the sole question on appeal was whether they had probable cause to believe that Pringle, a passenger in the vehicle, had committed that crime. The Court held that the officers did have probable cause to arrest appellant for possession, stating:

> We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus, a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly.

*Pringle*, 540 U.S. at 372, 124 S.Ct. 795.

In so holding, the Court distinguished *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), which, appellant argues, applies to the present case. In *Ybarra*, police officers obtained a warrant to search a tavern and its bartender for evidence of possession of a controlled substance. After the officers entered the tavern, they conducted patdown

searches of the customers present in the tavern, including Ybarra. Inside a cigarette pack retrieved from Ybarra's pocket, the police found six packets of heroin. The Supreme Court held that the search warrant did not permit body searches of all of the tavern's patrons and that the officers could not pat down the patrons for weapons absent *individualized suspicion*. *Pringle*, 540 U.S. at 373, 124 S.Ct. 795.

In *Pringle*, however, the Supreme Court stated,

[t]his case is quite different from *Ybarra*. Pringle and his two companions were in a relatively small automobile, not a public tavern. In *Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), we noted that *'a car passenger*—unlike the unwitting tavern patron in *Ybarra*—*will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing. Id.* at 304–305, 119 S.Ct. 1297. Here we think it reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, *an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.*

*Pringle*, 540 U.S. at 373, 124 S.Ct. 795 (emphasis added).

Similarly, in the case before us, it was reasonable for Officer Kelley to suspect that all of the vehicle's occupants were engaged in a common enterprise, i.e., stealing and/or possessing a stolen vehicle. It is important to reiterate how significantly less of a connection need be shown to establish probable cause than need be shown to support a guilty verdict. Again, the following facts were adduced at the motions hearing.

On December 15, 2005, at 12:41 a.m., Officer Kelley observed a vehicle run a red light. The vehicle then proceeded to travel approximately 20 miles per hour over the posted speed limit. While following the vehicle, Officer Kelley and Officer Niebauer ran the vehicle registration through police dispatch and learned that the vehicle had been stolen in Leesburg, Virginia. The officers then attempted to stop the

vehicle, by activating the police cruiser's lights and siren, however, the vehicle continued traveling approximately a quarter of a mile to a half of a mile before pulling over off of the exit ramp. Once the vehicle pulled over, the officers conducted a "high-risk" stop of the vehicle based on the fact that the vehicle was reported stolen and initially failed to comply when the officers activated their emergency equipment. After each of the vehicle's occupants were instructed to exit the vehicle following the stop, an initial pat down for weapons was possibly conducted, and each individual was handcuffed and detained, a determination was made that all of the vehicle's occupants were going to be placed under arrest for the vehicle theft. Approximately two minutes elapsed between the initial stop and the arrests. Subsequently, before placing appellant in his police cruiser, Officer Kelley searched appellant.

No evidence was presented at the suppression hearing indicating that any of the three individuals admitted to stealing the vehicle at the time of the arrest. Clearly, the vehicle's driver was in possession of stolen goods, an obvious criminal activity, and was subject to arrest. There was nothing to indicate to the officers, however, that he was in fact the thief or the only thief; the officers only had knowledge that the car had been stolen.

■ Unlawful possession may be actual or constructive, joint or individual. *See, e.g., Handy v. State,* 175 Md.App. 538, 930 A.2d 1111 (2007) (discussing constructive possession of contraband).[5] The officers could infer, based on the totality of

---

**5.** *Citing Folk v. State,* 11 Md.App. 508, 275 A.2d 184 (1971), we observed that four factors formed "[t]he common thread" of the cases sustaining convictions based on a theory of joint possession ...: 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

the circumstances, that appellant was engaged in a common enterprise with the driver. This is analogous to the situation in *Pringle*, where the officers had knowledge of a large quantity of drugs and cash, an obviously criminal activity, in the vehicle in which Pringle was a passenger. As in *Pringle*, where the quantity indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him, the driver, in possession of a stolen vehicle, would be unlikely to admit an innocent person to a stolen vehicle.

The court, in *In re T.H.*, 898 A.2d 908 (D.C.2006), distinguished *Pringle's* conclusion that an individual involved in criminal activity would be unlikely to admit an innocent person with the potential to furnish evidence against him. In that case, police arrested two passengers in an illegally parked vehicle for possession of fireworks that were found in the vehicle. The court held that the presence of the fireworks was not so "obviously criminal" as to make the driver of the vehicle "unlikely to admit an innocent person with the potential to furnish evidence against him." *In re T.H.*, 898 A.2d at 914 (*quoting Pringle*, 540 U.S. at 373, 124 S.Ct. 795). The court explained that the arrests occurred within days of the Fourth of July, and in the District of Columbia some fireworks are legal while others are not. *Id.* Moreover, the fireworks were fully visible to any member of the public walking by, suggesting that whoever placed them there believed there was no need for concealment, and finally, both T.H. and the other passenger informed the police that the driver of the vehicle was the owner of the fireworks. *Id.* This is not the situation before us.

*Rohde v. City of Roseburg*, 137 F.3d 1142 (9th Cir.1998), involved the arrest of a passenger in a stolen vehicle. The court reached a conclusion contrary to that which we reach, holding that "[a]bsent some indication of a relationship more substantial than that of driver or passenger, the arresting officer cannot simply impute the driver's presumptive awareness of the vehicle's legal condition to the passenger," *id.* at 1144, but that decision was prior to *Pringle*, and, in any event,

in the context of a civil action for false arrest pursuant to 42 U.S.C. § 1983.

Similarly, in *Griffin v. City of Chicago,* 406 F.Supp.2d 938 (N.D.Ill.2005), the court concluded that a "plaintiff's presence in the suspected car was, by itself, insufficient as probable cause for arrest." *Id.* at 945. Again, however, *Griffin* arose out of a civil suit for false arrest pursuant to 42 U.S.C.1983, and the court emphasized that there was a strong policy in Illinois that probable cause be determined by a jury; thus it could not be decided on summary judgment. *Id.* Moreover, the court noted that the "undisputed facts" revealed that the "plaintiff was a passenger in the car, there [were] no obvious or physical markings on the car to indicate that it had been stolen, and plaintiff was not doing anything illegal at the time [the officer] approached." *Id.*

In *Sanders v. City of Philadelphia,* 209 F.Supp.2d 439(E.D.Pa.2002), a civil suit for, *inter alia,* unlawful detention and false arrest, the court concluded that there was probable cause to arrest the passenger as a matter of law. In that case, the police officer noticed an automobile engaged in erratic maneuvers. Subsequently, the officer received confirmation that the vehicle had been reported stolen. After pulling the vehicle over, he found two people inside—the driver and the plaintiff. Both were arrested, but the charges against the plaintiff were later dismissed, and she brought suit alleging that the officer lacked probable cause when detaining and ultimately arresting her. The court entered summary judgment in favor of the defendants on all federal and state false arrest and unlawful detention claims, stating:

> While it is true the plaintiff was not operating the automobile, a prudent person is perfectly justified in believing that a passenger is somehow involved in the theft whether it be as an accomplice, conspirator or primary suspect. Sanders' apparent voluntary presence in a stolen automobile gives sufficient probable cause to warrant arrest and further investigation by the police.

When balancing the interests of the individual riding in a stolen car against those of society it is clear that the interests of society prevail. A finding of no probable cause forces police to allow potential criminals in such a situation to go free only to be able to hinder society again by repeating the crime. On the other hand, a finding of probable cause allows the police to detain the occupant of a stolen car long enough to find out what involvement, if any, the suspect had in the theft itself. The decision here is an easy one. The interests of society must prevail in this situation. The burden to the individual who had nothing to do with the car's theft will, after explanation, be minimal.

*Id.* at 442.

Contrary to appellant's assertion, we conclude that pursuant to *Maryland v. Pringle,* 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), and based on the facts of this case, it was reasonable for the officers to infer that the driver *and* the passengers were in possession of a confirmed stolen vehicle based on an inference of common enterprise among the individuals; thus, appellant was lawfully arrested and searched incident thereto.

### 2. *Terry* Stop; Reasonable Articulable Suspicion

Pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "[t]here are instances in which a person, who is not under arrest, may be detained. Without effecting an arrest, a police officer with reasonable suspicion, supported by articulable facts, that criminal activity 'may be afoot,' may stop and detain a person, briefly, for investigative purposes." *Longshore,* 399 Md. at 506, 924 A.2d 1129 (*citing Terry,* 392 U.S. at 30, 88 S.Ct. 1868) (other citations omitted). "Reasonable suspicion" is a less demanding standard than probable cause. *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Typically, an investigatory, or *Terry,* stop is justified "where there is some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. Stated differently, if, under the totality of the circumstances, a police officer has a particular-

ized and objective basis for suspecting criminal activity by the person stopped, then the stop and temporary detention is justified." *Longshore,* 399 Md. at 507, 924 A.2d 1129 (other citations omitted).

In addition to investigatory stops and temporary detentions, police officers are also permitted to take other intrusive actions, i.e., "pat-down" searches, in furtherance of the goal of protecting officer safety. *Id.* at 508, 924 A.2d 1129. Pat-down searches, or "frisks," are allowed where the officer

has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Terry,* 392 U.S. at 27, 88 S.Ct. 1868.

In *Longshore,* the Court of Appeals noted that "the permissible scope of a *Terry* stop has expanded in the past few decades, allowing a police officer to neutralize dangerous suspects during an investigative detention using measures of force such as placing handcuffs on suspects, placing the suspect in the back of police cruisers, drawing weapons, and other forms of force typically used during an arrest," *Longshore,* 399 Md. at 509, 924 A.2d 1129. Nevertheless, very limited instances have been recognized in which a show of force, such as placing a suspect in handcuffs, is not an arrest. *Id.* In fact, special circumstances justifying handcuffing a suspect prior to arrest have been limited to instances where the officers suspected that a violent crime had occurred, or where the officers believed the suspect to be armed or dangerous, or a flight or safety risk. *Id.* at 514–15, 924 A.2d 1129.

In the present case, we conclude that the drugs were seized as a result of a search (which we earlier concluded was lawful), as distinguished from a pat-down for weapons, because the drugs were not discovered pursuant to a pat-down, if one occurred. Officer Kelley testified that he conducted a

search and removed the drugs from appellant's pocket, after he thought a pat-down had already occurred. In addition, the seizure of the drugs can not be sustained under the plain feel doctrine enunciated in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (holding that the police may seize non-threatening contraband detected through the sense of touch during a protective pat-down search of the sort permitted by *Terry*, so long as the search stays within the bounds marked by *Terry*), because the testimony does not support that conclusion.

▆▆▆ We also conclude that appellant was arrested prior to the search. Appellant was handcuffed and reported as arrested at 12:43, two minutes after the stop, and presumably, after a pat-down. Clearly, appellant was not free to leave. Thus, the officers show of force, i.e., placing appellant in handcuffs, indicates that an arrest had taken place.

▆▆▆ These conclusions notwithstanding, it is evident that the officers had reasonable articulable suspicion that criminal activity was afoot for purposes of a *Terry* stop. The officers had been advised that the vehicle that ran a red light and was traveling over the posted speed limit had been reported stolen. The officers attempted to pull the vehicle over, but the driver did not comply for a quarter to a half of a mile. Based on the totality of the circumstances, the officers conducted a high-risk stop of the vehicle with weapons drawn.

We acknowledge that, for purposes of a *Terry* stop, and on the basis of the circumstances before us, there is a distinction to be drawn between the driver of the stolen vehicle and the passengers in the stolen vehicle. Thus, we shall address that distinction.

Pursuant to *Whren v. U.S.*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), in which the Supreme Court held that the detention of a motorist is reasonable when probable cause exists to believe that a civil traffic violation has occurred, *id.* at 806, 116 S.Ct. 1769, the officers in the present case clearly had a right to stop the vehicle for traffic law infractions, i.e., running a red light and traveling in excess of the speed limit.

More than that, the officers had reasonable articulable suspicion pursuant to *Terry* once they discovered that the vehicle had been stolen. Once the vehicle was stopped, the question becomes whether the officers were justified in detaining the passengers as well as the driver.

In *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), the Supreme Court held that for purposes of officer safety, "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Id.* at 415, 117 S.Ct. 882. The question remains, however, whether a passenger may be detained absent reasonable articulable suspicion as to the passenger when the passenger wants to leave, i.e., whether "an officer may forcibly detain a passenger for the entire duration of the [traffic] stop." *Id.* at 415, n. 3, 117 S.Ct. 882. That issue was not addressed in *Whren,* and was left expressly undecided in *Wilson.*

In *Dennis v. State,* 345 Md. 649, 693 A.2d 1150 (1997),[6] the Court of Appeals concluded that when the purpose of the detention was solely for officer safety, not for investigation, and at the time the passenger attempted to leave the concern for safety did not exist, the passenger could not be detained. *Id.* at 653–54, 693 A.2d 1150. In other words, the "police officer must intend the stop to be an investigative stop, not just a detention for safety purposes," *Dennis,* 342 Md. at 209, 674 A.2d 928, in order to detain a passenger who wants to leave the scene in the absence of a threat to officer safety.

Furthermore, in *Byndloss v. State,* 391 Md. 462, 893 A.2d 1119 (2006), the Court of Appeals indicated that it was reasonable to detain both the driver and the passenger of a vehicle pulled over for a traffic infraction, for 30 minutes, to conduct checks on the validity of the driver's license and registration, and to conduct a routine check for warrants. In *Byndloss,* however, unlike in *Dennis,* the passenger did not attempt to

---

**6.** There is another *Dennis v. State,* 342 Md. 196, 674 A.2d 928 (1996), that was decided prior to the Supreme Court's decision in *Whren.*

leave. In the case before us, there was no attempt by appellant to leave the scene prior to the time that he was arrested.

 Under those circumstances, and based on *Dennis* and *Byndloss,* the officers were justified in detaining appellant pending completion of checks on documents and warrants. Here, unlike in *Dennis,* the vehicle was not stopped based solely on traffic violations; the officers also had knowledge that the vehicle was stolen. The officers clearly intended, prior to the stop, to conduct an investigation, which they initiated prior to the stop. Once the vehicle was stopped, the officers clearly intended to, and did, continue with that investigation. In other words, the detention was not just based on officer safety; rather, it was intended to be, and was, an investigatory stop. Thus, absent an arrest and search, the detention for 10 minutes, until learning of warrants, was reasonable, and the officers had reasonable articulable suspicion to detain the passengers as well as the driver during the investigation.

### 3. Inevitable Discovery

 As an alternative basis for our decision, we conclude that, if the arrest and search were unlawful, the motion to suppress was properly denied because the drugs would have been inevitably discovered.

In *Myers v. State,* 395 Md. 261, 909 A.2d 1048 (2006), the Court of Appeals reviewed the "three judicially acknowledged methods by which evidence can be shown to have been purged of the primary taint," *id.* at 284, 909 A.2d 1048, i.e., three exceptions to the exclusionary rule, given a Fourth Amendment violation: attenuation, independent source, and inevitable discovery.

In *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the Supreme Court acknowledged that it is possible that the challenged evidence can "become so attenuated as to dissipate the taint."
\* \* \*

In *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Supreme court acknowledged the second method of purging the primary taint, known as the "independent source" test. The court concluded that, if it can be shown that the evidence was discovered as a result of an independent source, the evidence should not be suppressed. *Segura,* 468 U.S. at 814, 104 S.Ct. 3380. The third method of purging the primary taint is known as "inevitable discovery" and operates to permit the introduction of otherwise tainted evidence that would ultimately or inevitably have been discovered notwithstanding a constitutional violation. *Nix v. Williams,* 467 U.S. 431, 443 n. 4, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

*Myers,* 395 Md. at 284–85, 909 A.2d 1048 (parallel citations and footnotes omitted).

The three doctrines overlap to some extent, and courts frequently confuse them. As we shall explain, in the present case there was no independent source, and there is no need for us to address attenuation because we shall conclude that the inevitable discovery doctrine applies.

 The independent source exception applies (1) when there is no causal connection between the unlawful act and the seizure of the evidence in the first instance, i.e., one could not conclude that the evidence would not have been obtained but for the unlawful act; and, (2) to evidence initially discovered during an unlawful search but later obtained independently from activities untainted by the initial illegality. *See Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

Assuming a causal connection exists, the attenuation doctrine may apply even though the evidence did not have an independent source and would not have been inevitably discovered. The question is when does the conduct become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost. In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court set forth a three part test: (1) time elapsed between the illegality

and the acquisition of the evidence; (2) presence of intervening circumstances; and, (3) the purpose and flagrancy of the misconduct. *Id.* at 603–04, 95 S.Ct. 2254. *See Myers,* 395 Md. at 285, 909 A.2d 1048; *U.S. v. Green,* 111 F.3d 515, 521–22 (7th Cir.1997) (applying the three-part attenuation analysis); *State v. Frierson,* 926 So.2d 1139, 1145 (Fla.2006) (relying substantially on the third factor of the analysis).

 The independent source and inevitable discovery doctrines have the same rationale. In both instances, exclusion of the evidence would put the police officers in a worse position than they would have been in the absence of misconduct. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The inevitable discovery doctrine applies if the evidence would have been discovered by lawful means. *Id.* at 445, 104 S.Ct. 2501. The doctrine involves no speculation; the focus is on historical facts capable of ready verification or impeachment. *Id.*

 Inevitable discovery differs from independent source in that the question is not whether the officers did in fact acquire the evidence in question by relying upon an untainted source, but whether the evidence, which was found because of a Fourth Amendment violation, would have been found lawfully. *U.S v. Herrold,* 962 F.2d 1131, 1140 (3rd Cir.1992). The State must show, by a preponderance of the evidence, that the lawful means which made discovery inevitable were being actively pursued prior to the illegal conduct. *U.S. v. Virden,* 488 F.3d 1317, 1322 (11th Cir.2007).

*Virden* involved a drug investigation and surveillance at several properties, including a residence, associated with Michael Adams. While watching the residence, officers observed a car exit the garage, and followed it to a gas station. The vehicle's driver, Virden, entered a store and made purchases. Upon his exit from the store, he was approached by officers and asked to remain there so that he could be questioned by another officer, Officer Stinson. After Officer Stinson arrived, Virden was frisked and identified. While en route to the gas station, Officer Stinson requested that the canine unit meet

him at the gas station to perform a drug sniff. During the course of questioning Virden, however, the officers learned that the main target of the investigation, Adams, was nearby. Concerned that Adams would detect their presence, Officer Stinson decided to place Virden in the police car to conceal him. Without placing Virden under an announced arrest, the officers placed him in the back of the police car in handcuffs. When placing Virden in the car, Officer Stinson still thought the canine unit was on its way to meet him at the gas station. Shortly thereafter, however, he learned that the canine unit was unavailable because it was assisting with the stop of Adams. Subsequently, Officer Stinson decided, without consent, to take Virden's car to the location where the canine unit was, and ultimately, drugs were recovered from the vehicle. The court held that the doctrine did not apply because the prosecution could not show that the officers were actively pursuing any lawful means at the time of the illegal conduct. *Id.* at 1323. The court stated, "[w]hen the officers learned that their lawful method of obtaining the evidence—bringing the canine unit to the scene in a reasonable time frame—would be unavailable, the officers decided to take an unlawful route to obtain the desired evidence . . . .," *id.*, i.e., detaining Virden and seizing his car. The court implied, however, that if officers had been conducting an ongoing investigation pursuant to the stop, which was lawful, the doctrine would apply if other conditions were met. *Id.*

In *Williams v. State,* 372 Md. 386, 813 A.2d 231 (2002), the Court of Appeals discussed the three exceptions to the exclusionary rule. In that case, officers assigned to the narcotics unit applied for search and seizure warrants for two adjoining rooms, room 106 and room 107, at a hotel. Before the warrants were obtained, but while the application was being prepared, officers approached the rooms in question and knocked on the doors. Williams, in room 106, asked who was at the door, and the police responded "maintenance." Williams opened the curtain, saw police, and then the officers heard him running away from the door. The officers then kicked the door in, without a warrant. Williams ran into room 107, followed by the police. Upon entering the room, the

officers smelled marijuana and observed a small amount of marijuana on the bed in room 107. They arrested Williams, and while searching him, they found cocaine in his pajamas. Williams' motion to suppress was granted, but on appeal, this Court held that the inevitable discovery doctrine applied. *Id.* at 399, 813 A.2d 231.

On certiorari, the Court of Appeals concluded that the independent source doctrine was inapplicable, and went on to consider whether the evidence was admissible under the inevitable discovery doctrine. *Id.* at 415, 813 A.2d 231. With respect to inevitable discovery, the Court concluded that the State must prove by a preponderance of the evidence that the evidence would have been found through lawful conduct. *Id.* This means that there must have been a lawful method for acquiring the evidence, and the evidence inevitably would have been discovered. *Id.* at 417, 813 A.2d 231. The Court further explained that this involves an analysis of what would have happened if a lawful investigation had proceeded, based on historical facts capable of easy verification, not what actually happened. *Id.* Ultimately, the Court determined that the State had not met its burden of proof.

*Williams* and other cases holding the doctrine inapplicable do so because discovery was not inevitable. In *Williams*, the court concluded that,

> [t]o apply the inevitable discovery exception to the cocaine found in petitioner's pajamas during the search incident to his arrest, we would have to find that he inevitably would have been in the motel rooms when the police executed the search warrant. On this sparse record, we cannot conclude that Williams inevitably would have been in the room, dressed in his pajamas, with the cocaine concealed therein.

*Id.* at 426, 813 A.2d 231.

*See Stokes v. State,* 289 Md. 155, at 164–66, 423 A.2d 552 (1980) (emphasizing that speculation will not satisfy the demands of the inevitable discovery doctrine); *United States v. Reilly,* 224 F.3d 986, 994–95 (9th Cir.2000) (refusing to apply inevitable discovery because the government failed to meet its burden of proof); *U.S. v. Vasquez De Reyes,* 149 F.3d 192, 196

(1998) (declining to apply inevitable discovery doctrine where application requires an unacceptable degree of assumption and speculation); *United States v. Cabassa,* 62 F.3d 470, 474 (2d Cir.1995) (noting that the government showing that more probably than not the evidence would have been in the [apartment] when a lawful search occurred was alone too susceptible to factual error to meet the government's burden); *U.S. v. Boatwright,* 822 F.2d 862, 865 (1987) (holding inevitable discovery doctrine inapplicable because there was no evidence that point[ed] to the inevitable discovery of weapons in control of the defendant); *U.S. v. Walker,* 43 F.Supp.2d 828, 836–37 (1998) (refusing to admit a jacket and keys seized from a defendant under inevitable discovery doctrine, reasoning that the defendant was in complete possession of these items prior to the unlawful arrest, and guessing what might have happened if the officers had acted constitutionally solely involves conjecture).

It is noteworthy that most of the cases finding inevitable discovery inapplicable involve the warrantless search of premises while efforts are under way to obtain a warrant, and not a stop of an automobile. In those situations, where drugs are found on the person, unless the person has been lawfully detained, it is not inevitable that the person would have been on the premises with the drugs at the time of the legal search. In the context of a vehicle stop, however, the person lawfully detained will be in or near the vehicle with no opportunity to dispose of the drugs while the investigation is proceeding.

There are analogous situations involving police investigations. In *U.S. v. Hammons,* 152 F.3d 1025 (8th Cir.1998), officers stopped a vehicle rented in Mrs. Hammons' name, and Mrs. Hammons, an occupant, consented to a search. During the course of the search, the officer found a garment bag containing a manila envelope. By the time the officer was ready to open the envelope, he was aware that the bag belonged not to Mrs. Hammons, but to Mr. Hammons; thus, he could not reasonably believe that he had Mrs. Hammons consent to search the envelope, rather, he needed to obtain consent from Mr. Hammons. After advising Mr. Hammons

that he would call a drug dog to conduct a sniff test of the package, Mr. Hammons involuntarily consented to a search of the envelope. The officer then opened the envelope, which contained cocaine. In holding that the inevitable discovery doctrine applied, the court concluded that "the only event that stopped the officer from calling the drug-canine unit before the officer opened the envelope was the defendant's consent. . . . We therefore find that a substantial, alternative line of investigation was underway which would have led to the inevitable discovery of the cocaine absent the police misconduct." *Id.* at 1030.

A similar situation existed in *U.S. v. Lamas,* 930 F.2d 1099 (5th Cir.1991). In that case, the officers conducted an unlawful warrantless search of the defendant's home. One officer started to leave to obtain a search warrant and had probable cause to do so, prior to the search. The occupant involuntarily consented, and thus, the officer did not leave to get the warrant. The consent was invalidated, but inevitable discovery applied because the officers would have obtained a warrant having "affirmatively turned in that direction before the unlawful consent was obtained." *Id.* at 1104.

A case very similar to the case at bar is *U.S. v. Glenn,* 152 F.3d 1047 (8th Cir.1998). In that case, a lawful stop of a vehicle occurred, pursuant to which the officer intended to access Glenn's driving record on the computer. The officer asked Glenn to follow him to his patrol car while he accessed the records, and when they reached the car, the officer unlawfully searched Glenn, which revealed a weapon. Glenn was then arrested, after which the officer ran a computer check and learned Glenn did not have a valid license. The court concluded that inevitable discovery applied because when the search took place, the officer was in the process of identifying Glenn as a permissible part of the initial traffic stop, and would have completed the license check even if he had found no weapon. That license check would have revealed that Glenn was operating a vehicle without a driver's license, subjecting him to arrest. *Id.* at 1050; *see also* LaFave, 6 Search & Seizure, § 11.4, n. 99, 101 (4th ed.).

Applying the aforementioned principles to the case sub judice, we conclude as follows: the stop was lawful and, while a frisk was lawful if it occurred, the search was not, assuming there was no probable cause to arrest at that time. Pursuant to the lawful stop, however, the officers were pursuing a lawful investigation which, within 10 minutes, revealed grounds to arrest appellant, i.e., the warrant. The officers would have lawfully detained appellant during that period absent an arrest and search—during which time appellant would have no opportunity to dispose of the drugs—because the totality of the circumstances, including knowledge that the car had been stolen, justified that detention pending the outcome of the investigation.[7] Once arrested, appellant would have been searched, and the drugs in his pocket would have inevitably been discovered.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

**7.** Pringle held, on the facts of that case, that probable cause existed. Reasonable articulable suspicion is a lesser standard.