960 A.2d 627

**Hayward T. HENDERSON**

v.

**STATE of Maryland.**

**No. 2344, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Nov. 26, 2008.

Nadine Jones (Arnold & Porter, LLP, on brief), Washington, DC (Nancy S. Forster, Public Defender, on brief), for Appellant.

Steven L. Holcomb (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: DAVIS, DEBORAH S. EYLER and CHARLES E. MOYLAN, JR. (Ret'd, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

Hayward T. Henderson, the appellant, was convicted by a jury in the Circuit Court for Harford County of possession of a controlled dangerous substance ("CDS"), in violation of Md.Code (2002); section 5–601 of the Criminal Law Article ("CL"), possession of CDS with intent to distribute, in violation of CL section 5–602; conspiracy to possess and distribute CDS, in violation of CL section 5–602; carrying and transporting a handgun in a vehicle on a public highway, in violation of CL section 4–203; and possession of a firearm "under sufficient circumstances to constitute a nexus to the drug trafficking crime," in violation of CL section 5–621. The court merged the simple possession conviction into the possession with intent to distribute conviction, and merged the carrying and transporting a handgun conviction into the firearm possession in relation to drug trafficking conviction. For each of the three remaining convictions, the court imposed identical concurrent 20–year sentences, all but 12 years suspended.

The appellant noted this appeal, posing three questions,[1] which we have combined and rephrased:

I. Did the motion court err in denying his motion to suppress evidence?

II. Did the trial court err in denying his motion for judgment of acquittal on the firearm charges?

For the following reasons, we shall affirm the circuit court's judgments.

## FACTS AND PROCEEDINGS

The appellant was one of two passengers in a vehicle that Harford County Sheriff's deputies engaged in a traffic stop on May 2, 2005, at 9:28 p.m. Deputy Paul Ruszala twice observed the vehicle fail to stop fully at stop signs, in violation of Md.Code (1977, 2006 Repl.Vol.), section 21–707 of the Transportation Article ("TR"). After the stop was called in, Deputy Scott Blankenship, who was patrolling nearby, responded to the scene for backup, arriving about two minutes later.

Deputy Ruszala performed a routine driver's license and registration check and recognized both the driver, Andre Austin, and the appellant because of their prior involvement in

---

1. The appellant worded his questions as follows:

I. Did the motions court err when it denied [the] motion to suppress by failing to find that the police officers had acted unreasonably when they detained [the appellant] for a traffic violation committed by [someone else]?

II. Did the motions court err when it denied [the] motion to suppress when it failed to find that Deputy Ruszala's continued detention of [the appellant] beyond the reasonable time it should have taken for Deputy Ruszala to have completed the traffic stop constituted a second stop of [the appellant] for which Deputy Ruszala had no probable cause or even reasonable suspicion?

III. Did the trial court err when it denied [the appellant's] motion for a judgment of acquittal on the basis that the [S]tate had failed to produce sufficient evidence that showed that [the appellant] had possessed, or otherwise had control or dominion over the handgun that was found under the front passenger seat of the car where there were no fingerprints found on the gun; at least two other occupants had had access to the car before [the appellant] had entered it; and the [S]tate's strongest evidence of possession was conflicting, at best?

CDS activities.[2] Deputy Ruszala requested a K–9 unit, which was dispatched at about 9:32 p.m. Deputy Blankenship, who had been conducting a computer check for outstanding warrants, determined that there was an outstanding arrest warrant for the other passenger, Maurice Kevin Lewis, for failure to appear at a probation hearing on CDS-related charges. Before effecting an arrest, Deputy Blankenship called for additional backup, because departmental safety guidelines require at least an equal number of police officers to suspects when an arrest is made. There was a "four to five minute" delay while the deputies awaited confirmation from the dispatcher that the warrant for Lewis was "still good and valid and active." The motion judge found that the arrest warrant confirmation was radioed to deputies on the scene at 9:39 p.m.

A third officer, Sergeant Carl Brooks, arrived at 9:40 p.m. Immediately afterward, Deputy Blankenship removed Lewis from the vehicle and placed him under arrest. A search of his person incident to arrest recovered $741 "in one of his pockets."

At 9:52 p.m., Corporal John Seilback arrived with his K–9, Sabre. (The K–9 unit had been on patrol in Havre de Grace, a 20–minute drive away.) Deputies ordered Austin and the appellant out of the vehicle to perform the K–9 scan. They frisked the two men for weapons, but found none. When Sabre gave a positive alert, Deputies Ruszala and Blankenship handcuffed Austin and the appellant. Deputy Ruszala searched Austin, recovered crack cocaine from inside a skull cap he was wearing, and arrested him. Deputies then searched the vehicle. They did not find CDS, but did find two weapons: a Glock model 23 handgun [3] under the front passenger seat where Lewis had been sitting, and a "silver colored

---

2. Deputy Ruszala had arrested Austin on a CDS charge roughly three weeks before the incident here.

3. This weapon, a .40 caliber, had a 13–round magazine fully seated inside. That magazine held nine hollow point rounds. Subsequent investigation revealed that the weapon previously had been stolen from a police officer.

pocket knife" on "the rear floorboard, between [the appellant's] feet." They also found, *inter alia,* a gray mask, two black baseball caps with the word "Police" on the front in white lettering, a video camera, cell phones, and $901 in currency.

Deputy Ruszala advised the appellant he was under arrest. Deputy Blankenship then searched him and found a clear plastic bag that held a loose rock of crack cocaine and five smaller baggies of crack cocaine.

We will include any additional facts as necessary to our discussion of the issues.

## DISCUSSION

### I.

### A.

When reviewing the denial of a motion to suppress under Rule 4–252, our inquiry is limited to the record of the suppression hearing. *Owens v. State,* 399 Md. 388, 403, 924 A.2d 1072 (2007); *Padilla v. State,* 180 Md.App. 210, 218, 949 A.2d 68 (2008). We defer to the hearing judge's first-level factual findings, applying a clearly erroneous standard of review. *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003). We view the facts and inferences reasonably drawn therefrom in the light most favorable to the prevailing party, in this case the State. *Id.; Morris v. State,* 153 Md.App. 480, 487–90, 837 A.2d 248 (2003). We "make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *State v. Williams,* 401 Md. 676, 678, 934 A.2d 38 (2007).

The legal basis for the appellant's motion to suppress evidence is an alleged violation of the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fourth Amendment is applicable to the states through incorporation by the Fourteenth Amend-

ment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■ The appellant contends the motion court erred in concluding that his detention prior to the K–9 scan did not violate the Fourth Amendment. He argues, based on *Dennis v. State*, 342 Md. 196, 674 A.2d 928 (1996) (*Dennis I* ), *aff'd on remand*, 345 Md. 649, 693 A.2d 1150 (1997) (*Dennis II* ), that, because he was just a passenger in the vehicle, the officers had to have a reasonable, articulable suspicion that he in particular had engaged in criminal activity in order to detain him. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). He maintains that there was no reasonable, articulable suspicion that *he* was engaged in any criminal activity until the positive K–9 alert. Therefore, his detention prior to the K–9 search was illegal and his motion to suppress should have been granted.

In *Dennis I*, a driver ran a red light and then engaged police officers in a high-speed chase. When eventually police caught up, the driver and passenger both exited the vehicle and attempted to leave the scene. Dennis, the passenger, ignored an order to stop and simply walked away. A police officer tackled him, and he fought back, striking the officer in the ribs. Dennis was convicted of disorderly conduct and battery. This Court affirmed the convictions in an unreported opinion.

The Court of Appeals reversed. It focused on the arresting officer's stated rationale for detaining Dennis:

"Well, we're taught for officers' safety to keep all subjects in the vehicle. Also, we did not know, the way the subject was acting, we did not know if he had contraband, if he had weapons . . . . [A]nd for our safety, we always ask all subjects to stay in the vehicle."

342 Md. at 208, 674 A.2d 928. Thus, the Court emphasized the police officer's subjective thought *not* to conduct a *Terry* investigative stop, but to detain the passenger solely to ensure officer safety. Because the officer failed to articulate a reasonable suspicion that Dennis had aided or abetted the driver,

whose only apparent crimes were the traffic violations, the Court held that Dennis had been arrested illegally. It relied upon language in *Terry* that appeared to require the arresting officer, not the prosecutor in a subsequent suppression hearing, to articulate specific reasons for seizing the subject of an investigatory stop. *Dennis I,* 342 Md. at 208, 674 A.2d 928 (police officer "did not . . . articulate the requisite reasonable suspicion *Terry* requires"); *id.* at 209, 674 A.2d 928 (*"Terry* requires that 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' ") (quoting *Terry, supra,* 392 U.S. at 21, 88 S.Ct. 1868). The Court so held even while remarking that "there may well have been sufficient evidence in the record from which [the officer] could have possessed a reasonable, articulable suspicion that the petitioner aided and abetted the criminality of the driver. Had he, in fact, *intended* to make a *Terry* stop, a different result might be appropriate." *Id.* at 208–09, 674 A.2d 928 (emphasis added).

The State filed a petition for *certiorari* in *Dennis I* to challenge the Court's focus in its analysis on the subjective intent of the arresting officer. By that time, a substantial body of Fourth Amendment jurisprudence had developed in favor of objective standards in determining whether various police-citizen encounters satisfy the reasonableness requirement of the Fourth Amendment.[4] *See, e.g., United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."); *Scott v.*

---

**4.** The Court of Appeals recently stated that the test for determining whether there exists reasonable, articulable suspicion to support an investigatory stop under *Terry v. Ohio* is an objective one. *Bost v. State,* 406 Md. 341, 958 A.2d 356 (2008), slip op. at 15 ("The test is 'the totality of the circumstances,' viewed through the eyes of a reasonable, prudent, police officer.") (quoting *Stokes v. State,* 362 Md. 407, 416, 765 A.2d 612 (2001)).

*United States,* 436 U.S. 128, 137, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) ("[A]lmost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him."); *United States v. Robinson,* 414 U.S. 218, 234–35, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ("[T]he danger to an officer . . . in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station . . . *is an adequate basis for treating all custodial arrests alike* for purposes of search justification.") (emphasis added); *id.* at 236, 94 S.Ct. 467 ("Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the officer] did not indicate any subjective fear of the respondent or that he did not himself suspect that respondent was armed."); *Terry, supra,* 392 U.S. at 21–22, 88 S.Ct. 1868 ("[I]n making [the assessment of reasonableness] it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?") (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

Three months after the Court of Appeals filed its opinion in *Dennis I,* the Supreme Court issued its decision in *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), upholding a so-called pretextual traffic stop. The Court stated its preference for objective determinations of Fourth Amendment validity: "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813, 116 S.Ct. 1769. Four months later, the Supreme Court issued a GVR (grant, vacate, and remand) order in *Dennis I,* in light of *Whren. Maryland v. Dennis,* 519 U.S. 802, 117 S.Ct. 40, 136 L.Ed.2d 4 (1996) (mem).

On remand, the Court of Appeals reaffirmed its previous holding, stating that *Whren* was inapposite because it addressed a different question:

Whether the temporary detention of a motorist who the police have probable cause to believe has committed a civil traffic violation is inconsistent with the Fourth Amendment's prohibition against unreasonable seizures unless a reasonable officer would have been motivated to stop the car by a desire to enforce the traffic laws.

*Dennis II,* 345 Md. at 651, 693 A.2d 1150 (quoting *Whren,* 517 U.S. at 808, 116 S.Ct. 1769). The Court noted that the Supreme Court had left open the specific issue in *Dennis:* "Whether 'an officer may forcibly detain a passenger for the entire duration of [a traffic] stop.'" *Dennis II,* 345 Md. at 653, 693 A.2d 1150 (quoting *Maryland v. Wilson,* 519 U.S. 408, 415 n. 3, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)). The Court then reaffirmed its decision in *Dennis I,* relying on its analysis that the police officer had failed to offer any explanation to support the notion that detaining Dennis was safer than simply permitting him to leave. *Dennis II,* 345 Md. at 654, 693 A.2d 1150. The State again petitioned for a writ of *certiorari,* which was denied. *Maryland v. Dennis,* 522 U.S. 928, 118 S.Ct. 329, 139 L.Ed.2d 255 (1997).

In this case, there was no evidence that the appellant attempted to leave, or was prevented from leaving, from the time the stop began until the K–9 was deployed. Moreover, shortly after the stop began, officers discovered the likelihood of an open arrest warrant for one of the passengers, Maurice Kevin Lewis. That single circumstance escalated the stop to a *Terry* stop with respect to Lewis. From that point forward, as the motion court aptly stated, "it was reasonable for the police officers on the scene to stop the processing of the traffic stop and concentrate their efforts on the apprehension of a person known to have an outstanding warrant." The discovery of $741 on Lewis's person raised further suspicion.

Once the officers prepared to conduct the K–9 scan, there already was a reasonable, articulable suspicion to support a *Terry* stop with respect to Austin and the appellant, even before the positive alert. In preparing for the scan, the officers had to remove the occupants from the vehicle for their

safety.[5] In doing so, they saw in plain view a knife on the car floor between the appellant's feet. Under the circumstances, a reasonable police officer would have taken further actions both to ensure his own safety and to investigate whether the appellant or his cohorts had other weapons or contraband.

When the K–9 alerted to the presence of CDS, deputies arrested the driver (Austin) and searched him, uncovering CDS on his person. They then searched the vehicle and recovered the knife they previously had seen and a handgun. As the motion court explained,

> We believe that reasonable and prudent persons, faced with the facts before these officers would conclude that the three individuals who were known drug users and sellers, out together at 10:00 p.m. at night, with one possessing substantial amounts of cash in his pocket, and the other having packets of CDS concealed under his hat were on a common scheme of using drugs or drug dealing and that [the appellant], as the rear seat passenger, was involved with them. We cannot feature a reasonable prudent police officer saying to [the appellant], "run along and be a good boy, you are obviously not involved in anything here."

We hold that the present case is factually distinguishable from *Dennis I* and *Dennis II*. The officers here did not violate the appellant's Fourth Amendment rights when they detained him, especially when there was substantial evidence of criminal activity entirely independent of the traffic violations, and no evidence that the appellant attempted to leave.

### B.

 The appellant also contends that the officers illegally extended the traffic stop at least nine minutes after Lewis's arrest until the K–9 unit arrived. Relying on *Wilkes v. State*, 364 Md. 554, 774 A.2d 420 (2001), *Munafo v. State*, 105

---

5. Deputy Blankenship testified that "the K–9 is trained to bite" and that as a matter of course vehicle occupants must be removed before a K–9 scan is conducted.

Md.App. 662, 660 A.2d 1068 (1995), and *Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990), he argues that, during that disputed nine-minute period, the officers lacked probable cause or even a reasonable articulable suspicion to detain him. He maintains that the disputed nine-minute time span constituted a second detention, illegal under the circumstances, and therefore the CDS seized from his person were fruit of the poisonous tree and should have been suppressed.

The State relies on *State v. Ofori,* 170 Md.App. 211, 906 A.2d 1089 (2006), and *Carter v. State,* 143 Md.App. 670, 795 A.2d 790 (2002), to refute the appellant's argument about the allegedly illegal second detention. According to the State, "this was no mere traffic stop." Rather, "at some point early on, and certainly no later than when police confirmed the warrant for Lewis, this traffic stop gravitated into a *Terry* stop."

We agree with the State's argument. The appellant attempts to cloak the encounter as a traffic stop. He focuses on the misdemeanor traffic violations, emphasizing that "Deputy Ruszala did not observe or smell any CDS from the car and [lacked] probable cause to think that a drug violation was taking place." According to the appellant, the vehicle occupants' prior histories as CDS offenders provided the only basis to suspect illegal activity, but that as a matter of law that constituted mere suspicion. He ignores that there was an outstanding arrest warrant for one of the passengers, Lewis, for failure to appear in a previous drug-related case and that a search incident to Lewis's arrest recovered a suspiciously large amount of currency. As we have explained, those two crucial facts escalated the initial traffic stop into a *Terry* stop.

The crux of the appellant's argument is that, once Lewis was arrested, Deputies Ruszala and Blankenship should have turned their attention to completing the traffic citation and concluding that encounter; in other words, it was a Fourth Amendment violation to linger nine minutes until the dog could arrive. If this had been a mere traffic stop, the appellant would be correct. *Wilkes, supra,* 364 Md. at 574, 774

A.2d 420 ("[O]nce the initial purpose for a stop is fulfilled, a continued detention is only permissible if justified by additional independent reasonable articulable suspicion."); *Ferris v. State,* 355 Md. 356, 372, 735 A.2d 491 (1999) ("[O]nce the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot."); *Pryor v. State,* 122 Md.App. 671, 682, 716 A.2d 338 (1998); *Munafo, supra,* 105 Md.App. at 673–76, 660 A.2d 1068; *Snow, supra,* 84 Md.App. at 264–65, 578 A.2d 816. However, once the warrant for Lewis was discovered and the search of Lewis's person revealed over $700 in cash, the situation evolved from a traffic stop into a *Terry* investigative stop. Therefore, it was constitutionally permissible for the officers to seize the appellant and Austin until the K–9 unit arrived.[6] *See Hatcher v. State,* 177 Md.App. 359, 395, 935 A.2d 468 (2007) (detention permitted because "unlike in *Dennis,* the vehicle was not stopped based solely on traffic violations").

The Supreme Court explained in *Maryland v. Pringle,* 540 U.S. 366, 372 n. 2, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), that the presence of a substantial amount of currency is an important factor in a probable cause analysis. Because the degree of certainty required to support an investigative stop is less than that necessary to establish probable cause, *see, e.g., United States v. Cortez,* 449 U.S. 411, 421–22, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), it is clear that the presence of a substantial amount of currency is a factor to be weighed in the totality-of-the-circumstances analysis here.

In *State v. Ofori, supra,* we explained the distinction between a traffic stop and a *Terry* investigative stop on the issue

---

**6.** On this issue we agree that the appellant was seized within the meaning of the Fourth Amendment. *See Brendlin v. California,* 551 U.S. 249, 127 S.Ct. 2400, 2403, 168 L.Ed.2d 132 (2007).

of whether and how long it may be permissible to wait for a K-9 scan:

> Nothing so well symbolizes the difference between a traffic stop and a *Terry*-stop for drugs as their respective attitudes toward the presence of drug-sniffing dogs. The dog has no role to play in a traffic stop. The dog may be the star performer in a *Terry*-stop for drugs. The traffic stop, once completed, will not await the arrival of the dog for so much as 30 seconds. The *Terry*-stop for drugs very deliberately and patiently does await the arrival of the dog. The dog's arrival is, indeed, the primary reason for waiting.

*Ofori, supra,* 170 Md.App. at 251, 906 A.2d 1089; *see also Carter, supra,* 143 Md.App. at 692–93, 795 A.2d 790. Here, there was reasonable, articulable suspicion to believe there was illegal activity afoot when Lewis was arrested on an open warrant and a search incident to his arrest uncovered an amount of currency consistent with drug dealing.[7] Therefore, the officers were permitted to pursue further their drug investigation by detaining the appellant and Austin until the K-9 unit arrived. Moreover, the officers' reasonable, articulable suspicion escalated when, just prior to the K-9 scan, they discovered a knife on the floor of the vehicle. Once the K-9 gave a positive alert, the officers had probable cause to search the vehicle and arrest the appellant and Austin. The motion court did not err in denying the appellant's motion to suppress evidence.

---

**7.** Reasonable articulable suspicion is a lower standard than probable cause. *See, e.g., Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."); *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."). Of course, the K-9 alert provided probable cause shortly afterward.

## II.

The evidence at trial revealed that the vehicle in which the appellant was riding was owned by his mother and was driven regularly by him. He was not driving on the night in question because his license was suspended.

■ The appellant challenges the sufficiency of the evidence to convict him of the firearm possession charges. He argues that the evidence that he exercised dominion or control over the weapon was equivocal because he was not the vehicle's owner; his relationship to the owner was not essentially different than the relationship between Austin and the owner; no fingerprints were recovered from the weapon; there was no evidence he was even aware of the gun's presence in the vehicle; and the officers' testimony about who had dominion or control over the gun was "conflicting."

The appellant cites the well-known factors in *Folk v. State*, 11 Md.App. 508, 518, 275 A.2d 184 (1971), which our cases use to determine joint possession:

> The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

He then mischaracterizes the *Folk* factors as "elements," and argues that the State failed to present sufficient evidence to support the jury findings. *See, e.g., Larocca v. State*, 164 Md.App. 460, 473, 883 A.2d 986 (2005) (*en banc*) (analyzing "factors" set forth above in *Folk, supra*). We shall set forth our own analysis of the *Folk* factors.

It is undisputed that the appellant was observed contemporaneously in the same vehicle in which the gun was found.

The gun was not within the appellant's view. It was found beneath the front passenger seat, where Lewis had been sitting. There was evidence, however, that the appellant had immediate access to the space beneath the front passenger seat. Deputy Blankenship testified that this space was more readily accessible to the rear passenger (*i.e.*, the appellant) than to the front passenger, because the clearance between the front of the front seat and the floor was at most one inch, whereas the clearance between the rear of the front seat and the floor was about four inches. Moreover, when Deputy Blankenship recovered the gun, it was concealed by "[a] small item of clothing ... behind the [front] seat and the handgun was right in front of it, with that article of clothing partially covering the handgun." Deputy Ruszala testified that the rear seat where the appellant was sitting was a bench-type seat, precluding the possibility of storing the weapon beneath it. This evidence supported a reasonable inference that the appellant knowingly stashed the gun beneath the front passenger seat.

Although the appellant did not have title to the vehicle, the State presented evidence that the vehicle was registered to Brenda Henderson, residing at the same address as the appellant. The appellant admitted in his testimony that the car belonged to his mother.

The weapon's presence in an area of the vehicle readily accessible to the appellant supports at least an inference of joint possession with the other occupants, if not exclusive possession. CL sections 4–203 and 5–621 do not require exclusive possession. *See, e.g.*, CL section 5–101(u) (" 'Possess' means to exercise actual or constructive dominion or control over a thing by one or more persons."); *Hatcher, supra*, 177 Md.App. at 388, 935 A.2d 468 ("Unlawful possession may be actual or constructive, joint or individual."); *Handy v. State*, 175 Md.App. 538, 563–65, 930 A.2d 1111 (2007).

Deputy Ruszala had been "involved in an arrest with [Austin] where [CDS] were recovered from him about three weeks

prior." The appellant was with Austin during this previous incident. These facts, combined with Deputy Ruszala's familiarity with the appellant "as a known CDS user/seller," also constituted "circumstances from which a reasonable inference could be drawn that the [appellant] was participating with others in the mutual use and enjoyment of the contraband." Furthermore, it is a commonplace observation that firearms are tools of the drug trade. *See, e.g., United States v. Wilson,* 484 F.3d 267, 270–71 (4th Cir.2007); *Burns v. State,* 149 Md.App. 526, 542, 817 A.2d 885 (2003); *Whiting v. State,* 125 Md.App. 404, 417, 725 A.2d 623 (1999). Simply because this observation, and the presence of the appellant with his erstwhile illicit companion Austin, are facts that may not, in themselves, rise to the level of proof beyond a reasonable doubt, does not mean that a reasonable jury could not consider them as circumstantial evidence of the appellant's guilt.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**