5 A.3d 1072

**Hayward T. HENDERSON**

v.

**STATE of Maryland.**

**No. 20, Sept. Term, 2009.**

Court of Appeals of Maryland.

Oct. 7, 2010.

Nadine Jones, Assigned Public Defender (Arnold & Porter LLP, Washington, D.C.; Nancy S. Forster, Public Defender, Baltimore, MD), on brief, for petitioner.

Jeremy M. McCoy, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

Opinion by MURPHY, J.

In the Circuit Court for Harford County, a jury convicted Hayward T. Henderson, Petitioner, of possession of a controlled dangerous substance with intent to distribute, and

possession of a firearm in connection with a drug trafficking crime. The State's evidence, which was seized during a warrantless search of Petitioner's person and his mother's automobile, was sufficient to establish that he committed those offenses on May 2, 2005. Petitioner argues that the State's evidence should have been suppressed on the ground that those searches violated his Fourth Amendment right to protection against unreasonable government intrusion.

After Petitioner's convictions were affirmed by the Court of Special Appeals in *Henderson v. State*, 183 Md.App. 86, 960 A.2d 627 (2008), he filed a petition for writ of certiorari, in which he presented this Court with two questions:

1. Does a passenger in a car pulled over by the police for a minor traffic violation have to attempt to leave the scene and be stopped by the police before Maryland will consider that passenger has been "detained," particularly when the U.S. Supreme Court in *Brendlin v. California* [551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) ] has already held that such a passenger is "seized" for Fourth Amendment purposes?

2. Can a law enforcement officer justifiably detain all passengers in a car pulled over for a traffic violation until a K–9 unit arrives on the basis that one of the passengers has an outstanding warrant and possesses $741 in cash?

We granted the petition. 407 Md. 529, 967 A.2d 182 (2009). For the reasons that follow, we answer "no" to each question, and therefore reverse the judgment of the Court of Special Appeals.

### Background

The opinion of the Court of Special Appeals includes the following factual background:

The [Petitioner] was one of two passengers in a vehicle that Harford County Sheriff's deputies engaged in a traffic stop on May 2, 2005, at 9:28 p.m. Deputy Paul Ruszala twice observed the vehicle fail to stop fully at stop signs, in violation of Md.Code (1977, 2006 Repl.Vol.), section 21–707

of the Transportation Article ("TR"). After the stop was called in, Deputy Scott Blankenship, who was patrolling nearby, responded to the scene for backup, arriving about two minutes later.

Deputy Ruszala performed a routine driver's license and registration check and recognized both the driver, Andre Austin, and the [Petitioner] because of their prior involvement in CDS activities. [Deputy Ruszala arrested Austin on a CDS charge roughly three weeks before this traffic stop occurred. Petitioner was with Austin at the time but had nothing on him.] Deputy Ruszala requested a K–9 unit, which was dispatched at about 9:32 p.m. Deputy Blankenship, who had been conducting a computer check for outstanding warrants, determined that there was an outstanding arrest warrant for the other passenger, Maurice Kevin Lewis, for failure to appear at a probation hearing on CDS-related charges. Before effecting an arrest, Deputy Blankenship called for additional backup, because departmental safety guidelines require at least an equal number of police officers to suspects when an arrest is made. There was a "four to five minute" delay while the deputies awaited confirmation from the dispatcher that the warrant for Lewis was "still good and valid and active." The motion judge found that the arrest warrant confirmation was radioed to deputies on the scene at 9:39 p.m.

[Per regulations pertaining to officer safety, a] third officer, Sergeant Carl Brooks, arrived at 9:40 p.m. Immediately afterward, Deputy Blankenship removed Lewis from the vehicle and placed him under arrest. [An alternate entry on the CAD report shows Lewis's arrest as taking place at 9:43 p.m.] A search of his person incident to arrest recovered $741 "in one of his pockets."

At 9:52 p.m., [approximately 24 minutes after the vehicle was initially stopped for the traffic violation, and 9–12 minutes after the arrest of Lewis,] Corporal John Seilback arrived with his K–9, Sabre. (The K–9 unit had been on patrol in Havre de Grace, a 20–minute drive away.) Deputies ordered Austin and [Petitioner] out of the vehicle to

perform the K-9 scan. They frisked the two men for weapons, but found none. When Sabre gave a positive alert, Deputies Ruszala and Blankenship handcuffed Austin and [Petitioner]. Deputy Ruszala searched Austin, recovered crack cocaine from inside a skull cap he was wearing, and arrested him. Deputies then searched the vehicle. They did not find CDS, but did find two weapons: a Glock model 23 handgun under the front passenger seat where Lewis had been sitting, and a "silver colored pocket knife" on "the rear floorboard, between [Petitioner's] feet." They also found, *inter alia,* a gray mask, two black baseball caps with the word "Police" on the front in white lettering, a video camera, cell phones, and $901 in currency.

Deputy Ruszala advised [Petitioner] he was under arrest. Deputy Blankenship then searched him and found a clear plastic bag that held a loose rock of crack cocaine and five smaller baggies of crack cocaine.

*Id.* at 89–91, 960 A.2d at 629–630 (footnotes omitted).

Petitioner filed a motion to suppress evidence seized, arguing that (1) the police officers had no legal basis to detain him for a traffic violation committed by Mr. Austin, and (2) the police impermissibly extended the length of the stop to allow the K-9 unit enough time to arrive.

At the suppression hearing, the State called Deputy Paul Ruszala, the officer responsible for the initial stop, who had filed a "STATEMENT OF PROBABLE CAUSE" pursuant to Md. Rule 4–211(b)(2) that included the following information:

At approximately 2128 hours [he] observed a 2002 Kia, 4-door, silver in color bearing MD tag 182AZW traveling west on Brookside Drive. The vehicle failed to come to a full and complete stop at the stop sign that is posted on Brookside Drive which intersects Fountain Rock Way and Topview Drive. [He] got behind the vehicle and further observed the vehicle fail to come to a full and complete stop at the stop sign on Topview Drive and Horseshoe Lane. [He] activated his emergency lights and initiated a traffic stop at Horseshoe Lane and Topview Drive.

[He] identified the driver by his New Jersey driver's license as Andre Tyree Austin. [He] knows Mr. Austin as a CDS user who was previously arrested for a CDS related offense approximately three weeks ago. Also, seated inside of the vehicle in the rear passenger seat behind the front passenger was [Petitioner] who [he] knows as a CDS user/seller with cautions as an armed person who has been known to have associations with the criminal street gang the "Crips." There was also a yet unidentified male who was sitting in the front passenger seat of the vehicle. [He] went back to his patrol vehicle to complete a license and registration check of the driver, complete the appropriate citations and await for backup Deputies to arrive.

Dep. Blankenship # 692 arrived on the scene as backup approximately 2 minutes later. Dep. Blankenship approached the front passenger to ask for identification. The front passenger consented by handing over his Maryland ID card that identified him as Kevin Maurice Lewis. Dep. Blankenship # 692 ran a wanted check on Mr. Lewis. The warrant check revealed that Mr. Lewis had a confirmed outstanding arrest warrant for failure to appear in court on a Violation of Probation on CDS related charges. Due to there being three known CDS user/sellers in the vehicle [he] waited for additional backup. Additional backup arrived and Mr. Lewis was ordered to exist the front passenger seat and he was placed under arrest of the outstanding warrant. An initial search of Mr. Lewis's person at the scene revealed no illegal contraband, but he did have $741.00 U.S. Currency on his person.

DFC Seilback K–9 unit # 7 arrived on scene and was used to scan the vehicle for illegal drugs prior to doing a search of where Mr. Lewis was seated inside of the vehicle. Mr. Austin and [Petitioner] were ordered to exit the vehicle so a search and K–9 scan could be safely performed. Dep. Blankenship could see on the rear floorboard between [Petitioner's] feet a silver colored pocket knife as [Petitioner] exited the vehicle. Mr. Austin was acting very nervous, figiting [sic] and asking why he had to get out of the car and

he stated that he didn't want to be searched. Dep. Ruszala began issuing Mr. Austin a citation for the second failure to stop at a stop sign violation. [Mr. Austin] signed his citation and was issued his warning and given back his ID and registration as the K–9 was scanning the vehicle. The K–9 alerted that there may be illegal drugs inside of the vehicle.

Deputy Ruszala's "STATEMENT OF PROBABLE CAUSE" omits the fact that, although Mr. Lewis was arrested at 21:40 p.m., the K–9 scan did not occur until 21:52 p.m. Fortunately for Petitioner, his trial counsel issued a subpoena for the Harford County "CAD" record of the "dispatches" that are of consequence to the issue of what occurred between the moment of the initial stop and the moment when the K–9 scan occurred. The following "time line" was established by the CAD record:

21:28 Initial stop

21:29 Dep. Ruszala requests information about Mr. Austin

21:32 K–9 unit "dispatched" to location of stop

21:39 Deputies are notified that the warrant issued for Mr. Lewis is "confirmed"

21:40 Mr. Lewis is arrested

21:46 K–9 unit reports that it is "under 5 minutes" from the location of the stop

21:52 K–9 unit arrives

During the suppression hearing, Deputy Ruszala testified as follows on direct examination:

Q: Once you had the operator, Mr. Austin's, license and registration, what did you do?

A: I started walking back to my patrol vehicle.

Q: Why did you do that?

A: So I could issue the appropriate citations, run a license check, wanted check, registration check ... And also ran though our CAD alert system. The rear passenger was also ran. [ ] We have, in the Sheriff's Office through dispatch, an alert system. And we just give them a name even if we

don't have their full information, they'll be able to tell if there [are] any warrants outstanding or any cautions on that person. . . .

[ ] Q: Did you do anything else while you were back there? You indicated that you saw what you told us was a violation.

A: Yes. I started issuing—I started filling out a traffic citation and a written warning.

* * *

Q: How long did that take?

A: I couldn't say exactly how long, but five to ten minutes; depends.

Q: [ ] Were [Austin and Petitioner] in custody at this time or just standing on the side? . . .

A: I think they were cuffed. They were detained.

The following transpired during Deputy Ruszala's cross-examination:

Q: And you mentioned that the [Petitioner], was he involved with you in a previous arrest[?]

A: Yes. He was with Austin, Mr. Austin.

Q: Did you find any drugs on him at that particular time?

A: At that time, no, but I did have prior knowledge that he had been arrested for drugs before.

Q: What prior knowledge did you have before?

A: Told by other deputies in our alert system that he has cautions for CDS.

Q: Is anybody's name put in that caution system when an arrest takes place when somebody has CDS?

A: I'm not sure I quite understand.

Q: When you arrested Mr. Austin previously, was Mr. Lewis' name placed within with that alert too?

A: It wasn't placed with Mr. Austin. He was in the alert system for a previous arrest that he had.

Q: Okay. If somebody is stopped and has CDS or is stopped with somebody else that has CDS, is he put in that alert system too?

A: I'm sorry. I'm not quite understanding your question.

The Court: Is it an arrest or a conviction that gets put in the system?

Q: Yes. If there is an arrest of somebody, could you—

A: I'm not in charge of the system. I don't put entries in there. I don't know how. Honestly, I don't know how they're—I don't know if it's by arrest or conviction. I don't know exactly how they're put in there.

Q: Who would know the answer to that question?

A: A dispatcher, possibly. One of the other—I'm not really sure who would know that. A dispatcher may know, but I couldn't tell you for sure. I don't know who makes entries in the alert system.

\* \* \*

Q: Why were you awaiting for [back-up]?

A: Because I had two known CDS people in the vehicle and another passenger I did not know, and I didn't feel safe walking back up to the vehicle.

Q: But it was only a traffic violation, correct; misdemeanor?

A: True, initially, yes.

Q: Right, at the time.

\* \* \*

Q: [Y]ou indicated you didn't recall when you got the first information back about the warrant, whether or not you had finished the traffic citations at that point in time?

A: That's correct, I don't remember if I actually was finished writing them yet or not ...[ ] We had several different things going on at one time....[ ]

Q: I understand, but you indicated approximately five to ten minutes to draft the citations.

A: Right....[ ]

Q: So in other words, you stopped working on the citations and did some other work instead?

A: It was all part of the stop, and we—Deputy Blankenship's running his name and trying to tell me what the status of the warrant is over dispatch. So I'm writing, completing the citations at the same time while trying to find out what's going on with him as well.

\* \* \*

Q: Why was the K–9 . . . requested at all?

A: Well, we had three known at the time. Once we found out what Mr.—who Mr. Lewis was, you know, three known, you know, CDS users with cautions on all three, prior arrests for. So that's why we called them to perform a scan.

Q: But there is no indication at that point in time of any drugs being involved in a minor traffic case only.

A: I'm sorry. Repeat your question.

Q: At the time the K–9 was requested, it's a minor traffic case, correct?

A: Yes.

Q: And you did not observe, smell any drugs on your own, and Blankenship didn't tell you there was any that he observed or smelled?

A: No. I didn't see or smell any drugs. No.

Q: So why did you call for the K–9?

[Objection.]

The Court: I think he answered that, but I'll give you one more try.[ ]

A: I advised and said there was three people with known CDS cautions in not a particularly great area in Edgewood . . . [o]ne of which had an open arrest warrant for drug violations.

Q: No violation of probation [on Lewis]?

A: For drug charges, yes.

\* \* \*

Q: But you weren't finished the paperwork until the dog did the search?

A: Like I said, I don't know exactly when we called for them, but I know he arrived within several minutes and he was performing the search as I was issuing Mr. Austin his citation warning.

\* \* \*

Q: What justification do you have of any indication that there's any drugs in the car[?] ... Because of their prior history of the people only?

A: Yes.

Q: But nothing to give you any indicia, right now, at that time, that there [were] drugs in the car.

A: Like I said, if I smelled drugs or saw drugs, I wouldn't have needed the K–9.

Q: And they couldn't leave until the dog sniffed the car.

A: I never told them they couldn't.

Q: Well, you pulled them out of the car; did you not?

A: I had to pull them out of the car so the K–9 could safely perform the sniff, yes.

Q: So, they couldn't leave until after the K–9 made the scan?

A: I didn't tell them they couldn't leave. They never asked.

Q: Didn't Mr. Austin object to getting out of the car?

A: Yes, he objected, but I have a right to order him out of the car to sign the citation and issue his warning....

Q: And [Petitioner] has to be out of the car in order for the other guy to sign the ticket?

A: Not for him to sign the ticket, no.

Q: Why was [Petitioner] getting out of the car then?

A: So that a scan could be performed of the vehicle.

\* \* \*

[After Petitioner and Austin are removed from the vehicle]

Q: Were you going to go back and search where he was sitting [ ]?

A: Yes.

Q: So you had not completed the traffic tickets yet; you decided now to work on the rest of—

A: For my safety, you know, once I learned that he's, you know—get him secured first, and then issue the citations once he's secured.

Q: You had the K–9 unit there; you had Sergeant Brooks there; you had Blankenship there; but you're the one to make the arrest?

A: Yes.

Q: So you stopped work on issuing the traffic citations? [ ] You didn't complete the citations, issue the citations, until after this took place.

A: I don't remember if I already finished them or if I did not.

Q: Okay. You don't recall whether or not before you arrested Lewis, the citations were issued or not?

A: I can't say for sure if I already did or did not.

Q: When you asked Mr. Austin to leave his vehicle ... [o]r ordered him to exit his vehicle, did he have the citations in his hand at that time or not?

A: I had the citations with me. I was ordering him out to bring him back so I could issue him the citations.... [M]y intentions were to have the K–9 scan the vehicle and to issue him the citation once he was back by the front of my car, yes; back by my car.

(Emphasis supplied).

The following transpired during Deputy Ruszala's redirect examination:

Q: Was th[e citation] signed outside the vehicle while the [K–9] scan was occurring?

A: That's correct.

Deputy Scott Blankenship was also called by the State at the suppression hearing, and testified as follows on direct examination:

Q: [T]ell His Honor what happened when you came on the scene with Deputy Ruszala. What did you find?

A: There were three occupants in the vehicle. We were in a high crime, high drug, open-air drug market, supported by violent gang activity.

The following transpired during Deputy Blankenship's re-cross-examination:

Q: When I asked was the passenger free to go, obviously, Lewis wasn't, but [Petitioner] was free to go at that point in time?

A: At that point in time we were conducting an investigation.

[Petitioner] was being detained.

Q: For what investigation?

A: **We were going to scan the vehicle.**

Q: What investigation was [Petitioner] involved in?

A: **When the K–9 arrived, we were going to scan the vehicle for any illegal drugs.**

Q: But why couldn't [Petitioner] go anyway? You hadn't gotten him out of the car anyway?

A: He was taken out of the car and placed in handcuffs. He was detained.

(Emphasis supplied).

While arguing that Petitioner's motion for suppression should be granted, his trial counsel stated:

Your Honor, I believe the cases that I would cite to the Court for consideration are *Pryor v. State*, 122 Md.App. [671, 716 A.2d 338 (1998) ]. It's a . . . case that deals with the duration of a valid stop. *Wilkins v. State*—I should say *Wilkes v. State, W–I–L–K–E–S v. State*, 364 Md. [554, 774 A.2d 420 (2001) ], an '01 case, and it deals with K–9 sniffs, and, of course, the case of *State v. Wallace*, 372 Md. 137[, 812 A.2d 291 (2002) ], it's an '02 case. It deals with dog sniffing and whether or not there's probable cause to search the passengers of a vehicle.

Basically I would point out to the Court that this was a non-serious traffic case, a stop in which a ticket, one ticket, and one warning was given for failure to stop at a stop sign,

that basically it took 24 minutes to issue that ticket, that the K–9 unit, Deputy Seilback, was up in Havre de Grace at that time indicating it took him 20 to 25 minutes to get to Edgewood, which I believe the CAD indicates that he arrived in about 24 minutes. Even Deputy Ruszala testified that he was basically waiting for the K–9 to arrive to do a dog sniff and do a search, which indicates that he was predisposed to do a search and took a routine traffic stop and stretched it in order to do a search, that the arrest of Lewis was by Blankenship, Deputy Blankenship. He's the one that called in and recognized the defendant, and that arrest should not have caused any delays of issuing the tickets, the traffic tickets.

\* \* \*

This is, in my opinion, a pretext to do a search by the dog and eventually by the police. There's no probable cause to search my client even after they search the vehicle because the gun found was under Lewis' seat, that there was no drugs found in the car, and therefore, they weren't arrested at the time they were searched, and therefore the search was illegal and should be suppressed.

The Circuit Court ultimately denied the motion to suppress in a Memorandum Opinion that included the following findings and conclusions:

The fact that there was a valid traffic stop has not been contested in this case. The argument is that the stop was unduly prolonged and that there was no basis for arresting Henderson under the factual circumstances that existed. Approximately 6½ minutes passed between the time that Deputy Ruszala made the initial stop and the time that he and Deputy Blankenship were advised that there was a warrant outstanding for Lewis, one of the occupants of the car. During that 6½ minutes Ruszala approached the Kia, got a license and registration information, called for check on Austin, the driver, for validity of his driver's license and registration and whether or not he was wanted and also called in a request as to whether or not Henderson, the rear

passenger of the vehicle[,] was wanted. Deputy Ruszala testified that he began writing one traffic citation and one warning. That is, he was issuing a citation for one of the stop sign violations and a warning for the second. The request for the canine was made at 21:32:23 hours, just before Deputy Blankenship called for a warrant check on Kevin Lewis as 21:32:48 hours. Deputy Ruszala testified that he was in the process of writing the traffic citation and warning when the information about the warrant on Lewis arrived. At that point Deputy Ruszala stopped his activity in writing the traffic citation and focused on the execution of the warrant on Lewis. Another unit was called for, for officer safety, and that officer, Sgt. Brooks, arrived almost simultaneously with the final confirmation that the warrant was in fact in the possession of the Sheriffs Department. Lewis was arrested, searched and the $741.00 in cash was found. At this point the traffic stop was not complete since Deputy Ruszala had not issued the citation and warning. We conclude that it was reasonable for the police officers on the scene to stop the processing of the traffic stop and concentrate their efforts on the apprehension of a person known to have an outstanding warrant and that such activity was not an undue extension of the time for the traffic stop.

\* \* \*

It was reasonable for the officers to conclude that these three persons, traveling together that evening, **with histories of drug use and selling,** and with a large amount of cash on the person of one and CDS on the person of the other were involved in the common activities of using and selling CDS.

\* \* \*

The most instructive case on point is that of *Burns v. State,* 149 Md.App. 526, 817 A.2d 885 (2003) with the opinion authored by Judge Moylan. Judge Moylan points out that *Johnson v. State,* 142 Md.App. 172, 788 A.2d 678 (2002) the

court held that a slight nexus between the passenger and contraband was enough to establish probable cause.

The officers clearly had [t]he right to arrest Austin, the driver of the car, based on the canine alert. He was patted down at that point and CDS was found on his person. Henderson had not been placed under arrest at this time. Judge Moylan noted in *Burns:* "We have recognized that in dealing with probable cause we deal with probabilities. 'These are not technical' they are factual and practical considerations of every day light all of which reasonable and prudent men, not legal technicians act."

We believe that reasonable and prudent persons, faced with the facts before these officers would conclude that the three individuals **who were known drug users and sellers,** out together at 10:00 pm at night, with one possessing substantial amounts of cash in his pocket, and the other having packets of CDS concealed under his hat were on a common scheme of using drugs or drug dealing and that Henderson, as the rear seat passenger, was involved with them. We cannot feature a reasonable prudent police officer saying to Henderson, "run along and be a good boy, you are obviously not involved in anything here." . . . . [ ]

In summary, Deputy Ruszala made a valid traffic stop. While processing that traffic stop he learned that one of the occupants of the vehicle had an open warrant. It was reasonable to suspend the activity of the processing of the traffic case while dealing with the confirmation of that open warrant and the arrest of Kevin Lewis. The search incident to the arrest of Kevin Lewis, further raised the suspicion of the officers, since they had **three known drug users** and one of them had substantial cash in his pocket. The canine unit was requested at the very outset of the traffic stop and arrived before Deputy Ruszala had time to return to the process of completing the traffic citations. The positive alert by the canine unit, gave a basis for probable cause to search the vehicle and to arrest the driver. A search of the driver produced packets of CDS concealed under his hat which was consistent with the theory of the officers at the

outset that these three young men were involved in drug dealing. The discovery of the loaded stolen handgun at a position where it was accessible to Henderson was a basis for his arrest and the search of his person revealing further CDS concealed in the crotch of his clothing was therefore reasonable.

(Emphasis supplied).

The Court of Special Appeals held that "[t]he officers here did not violate [Petitioner's] Fourth Amendment rights when they detained him, **especially when there was substantial evidence of criminal activity entirely independent of the traffic violations,** and no evidence that the [Petitioner] attempted to leave." 183 Md.App. at 96, 960 A.2d at 633. With respect to the issue of whether the officers illegally extended the traffic stop at least nine minutes after Lewis's arrest until the K-9 unit arrived, the Court of Special Appeals stated:

According to the [Petitioner], the vehicle occupants' prior histories as CDS offenders provided the only basis to suspect illegal activity, but that as a matter of law that constituted mere suspicion. He ignores that there was an outstanding arrest warrant for one of the passengers, Lewis, for failure to appear in a previous drug-related case and that a search incident to Lewis's arrest recovered a suspiciously large amount of currency. As we have explained, those two crucial facts escalated the initial traffic stop into a *Terry* stop.

**The crux of the [Petitioner's] argument is that, once Lewis was arrested, Deputies Ruszala and Blankenship should have turned their attention to completing the traffic citation and concluding that encounter; in other words, it was a Fourth Amendment violation to linger nine minutes until the dog could arrive. If this had been a mere traffic stop, the [Petitioner] would be correct.** *Wilkes, supra,* 364 Md. at 574[, 774 A.2d at 432] ("[O]nce the initial purpose for a stop is fulfilled, a continued detention is only permissible if justified by additional independent reasonable articulable suspicion."); *Ferris v. State,* 355 Md. 356, 372, 735 A.2d 491, [499] (1999) ("[O]nce the underlying

basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot.")[.]

\* \* \*

The Supreme Court explained in *Maryland v. Pringle*, 540 U.S. 366, 372 n. 2, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), that the presence of a substantial amount of currency is an important factor in a probable cause analysis. Because the degree of certainty required to support an investigative stop is less than that necessary to establish probable cause, *see, e.g., United States v. Cortez,* 449 U.S. 411, 421–22, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), it is clear that the presence of a substantial amount of currency is a factor to be weighed in the totality-of-the-circumstances analysis here.

\* \* \*

. . . . Here, there was reasonable, articulable suspicion to believe there was illegal activity afoot when Lewis was arrested on an open warrant and a search incident to his arrest uncovered an amount of currency consistent with drug dealing. Therefore, the officers were permitted to pursue further their drug investigation by detaining the [Petitioner] and Austin until the K–9 unit arrived. Moreover, the officers' reasonable, articulable suspicion escalated when, just prior to the K–9 scan, they discovered a knife on the floor of the vehicle. Once the K–9 gave a positive alert, the officers had probable cause to search the vehicle and arrest the [Petitioner] and Austin. The motion court did not err in denying the [Petitioner's] motion to suppress evidence.

183 Md.App. at 97–99, 960 A.2d at 634–635. (Footnotes omitted).

### Discussion

■ When reviewing the Circuit Court's denial of a motion to suppress, we consider only the record of the suppression

hearing and we give great deference to that court's factual findings unless clearly erroneous. *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749, 755 (1987). We, however, make our own independent, constitutional appraisal of the police conduct at issue. *McMillian v. State,* 325 Md. 272, 281, 600 A.2d 430, 434–35 (1992).

## I.

In *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the United States Supreme Court held that the Fourth Amendment does not prohibit a law enforcement officer who observes a traffic violation from stopping the motorist who committed that violation, even though the true reason for the stop is the officer's interest in investigating whether the motorist is involved in other criminal activity. Forcible traffic stops recognized as proper by that decision have become known as *Whren* stops.

The right to make a forcible stop does not justify a subsequent unreasonable detention. In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the United States Supreme Court noted that

> the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. Moreover, in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation.

*Id.* at 709, 103 S.Ct. at 2645.

It is clear that Petitioner was "detained" from the moment that Deputy Ruszala made a forceable stop of Petitioner's vehicle. In *Arizona v. Johnson,* —— U.S. ——, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009), the United States Supreme Court held that when law enforcement officers make a forceable stop of an automobile, "a passenger is seized, just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.'" *Id.* at ——, 129 S.Ct. at 787, quoting

*Brendlin v. California,* 551 U.S. 249, 256–259, 127 S.Ct. 2400, 2405–2407, 168 L.Ed.2d 132 (2007). The *Johnson* Court stated:

> The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop ... In sum, as stated in *Brendlin,* a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will.

—— U.S. at ——, 129 S.Ct. at 788 (citations omitted).

 Petitioner argues that, although his detention was lawful until Mr. Lewis was arrested, it was unreasonable to detain him thereafter. Although the Circuit Court and the Court of Special Appeals rejected Petitioner's contention that his Fourth Amendment rights were violated by the continued detention that followed Mr. Lewis's arrest, neither of those courts held that the K–9 scan occurred during a period of time reasonably necessary to issue traffic citations to Mr. Austin. Both the Circuit Court and the Court of Special Appeals were correct in concluding that, once Mr. Lewis was arrested, Petitioner's continued detention could not be justified as pursuant to an "ongoing" traffic stop.

In *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999), while holding that a permissible traffic stop evolved into an unconstitutional "second" stop unsupported by reasonable suspicion, this Court stated:

> [T]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been ful-

filled, the continued detention of the car and the occupants amounts to a second detention. *See [Florida v.] Royer,* 460 U.S. [491] at 500, 103 S.Ct. [1319] at 1325–26 [ (1983) ]. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot. *United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir.1994).

355 Md. 356, 372, 735 A.2d 491, 499.

In *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001), while affirming the denial of a motion for suppression of contraband seized subsequent to a K–9 alert that occurred while a traffic stop was "ongoing," this Court stated:

The K–9 unit arrived on the scene and conducted the scan of petitioner's Escort *prior* to Trooper Graham receiving radio verification of the validity of petitioner's driver's license, vehicle registration card, and warrants check. The traffic stop was ongoing at the time the K–9 scan was employed. At the suppression hearing, there was no evidence that the police extended or delayed the traffic stop beyond the time necessary to reasonably complete the actions needed to resolve the initial purpose for the stop. A reasonable inference from the evidence in the record is that the K–9 scan occurred while the initial reason for the traffic stop was still being investigated.

*Id.* at 570, 774 A.2d at 429–430.

In the case at bar, the CAD "dispatch" records provide irrefutable evidence that the police extended the traffic stop beyond the time reasonably necessary to (1) place Mr. Lewis under arrest, and (2) issue traffic citations to Mr. Austin. At the time Mr. Lewis was arrested, the deputies knew that there were no "open" warrants for either Mr. Austin or Petitioner. As Deputy Blankenship testified, "When the K–9 arrived, we were going to scan the vehicle for any illegal drugs." As the CAD records make clear, the K9 unit arrived twelve minutes

after Mr. Lewis was arrested. Under these circumstances, it would be unreasonable to conclude that the K–9 scan occurred at a time when the traffic stop was "ongoing."

## II.

■ The Fourth Amendment protects occupants of automobiles against continued detentions based on less than reasonable articulable suspicion. As stated above, the Circuit Court and the Court of Special Appeals concluded that the deputies had "reasonable articulable suspicion" to detain Petitioner until the K–9 unit arrived. From our independent constitutional appraisal of the record, however, we reject the State's argument that Petitioner traveled the streets of Edgewood "enveloped in reasonable articulable suspicion" because (1) his name was in the Sheriff's Office "alert system," (2) he was in an automobile occupied by two other persons whose names were also in the "alert system," (3) a "failure to appear" (FTA) warrant had been issued for one of the other occupants of the automobile, and (4) $741.00 in currency was found during the search of the person for whom the FTA warrant had issued.

■ As the Honorable Charles E. Orth, Jr. has noted,[1] a person who has been convicted of a crime does not "henceforth . . . [travel] the streets enveloped in probable cause." *Silbert v. State*, 10 Md.App. 56, 65, 267 A.2d 770, 774 (1970). In *Silbert*, the Court of Special Appeals reversed "lottery" convictions of Philip "Pacey" Silbert on the ground that the incriminating evidence found on his person and in his automobile was seized during the execution of a search warrant that should not have been issued, even though it was issued on the basis of an affidavit that referred to Mr. Silbert's most recent convictions for lottery violations. Judge Orth stated:

The crux of this case is whether there was probable cause for the issuance of the search warrant [issued on April 9,

---

1. Judge Orth served on this Court from June 8, 1976 until December 31, 1979. He served on the Court of Special Appeals from January 6, 1967 until his appointment to this Court, and was appointed Chief Judge of the Court of Special Appeals on November 3, 1972.

1969] under the authority of which the police searched the person of Philip Silbert and the automobile driven by him. We find that there was not.

\* \* \*

Unless it can be said, and we do not believe that it can be, that henceforth from appellant's convictions of lottery offenses in 1969 he travelled the streets enveloped in probable cause which was apparent to any officer who had knowledge of the evidence adduced at the trial leading to the [March 21,] 1969 convictions, we think that the facts and circumstances within the knowledge of [the affiant] as set out in the affidavit did not establish that the officer had probable cause to believe that appellant had lottery paraphernalia concealed on his person or in the car driven by him. *Id.* at 58, 65, 267 A.2d at 770, 774.

█ It is clear from the above quoted testimony that the deputies attached a great deal of importance to the fact that Petitioner's name was in the "alert" system. So did the Circuit Court and the Court of Special Appeals.[2] A warrantless search, however, is presumptively unreasonable, and the State has the burden of overcoming that presumption. As we make our independent appraisal of the constitutionality of Petitioner's continued detention, we attach a great deal of importance to the fact that the State provided no explanation whatsoever for how a person's name gets into that system.

From the absence of any explanation for how a person's name gets into the "alert" system, it is reasonable to infer that there are persons whose names got into that system on the basis of utterly unreliable hearsay information. Moreover, based upon what was *not* testified to by the State's witnesses, although we have no idea how Deputy Ruszala "knows" Petitioner, it is reasonable to infer that Petitioner's name did not get into the system because Deputy Ruszala was an eyewit-

---

**2.** According to the Circuit Court, Petitioner, Mr. Austin and Mr. Lewis "were known drug users and sellers." According to the Court of Special Appeals, "there was substantial evidence of criminal activity entirely independent of the traffic violations."

ness to Petitioner's (1) admission that he was a drug seller, (2) conviction of a violation of the Maryland Controlled Dangerous Substances Act, and/or (3) sale of a controlled dangerous substance. It is also reasonable to infer that on the evening that he stopped Petitioner's vehicle, Deputy Ruszala had not made any observations that indicated that the occupants of that vehicle were engaging in activity consistent with the purchase or sale of controlled dangerous substances. If the State were able to present any evidence that would contradict these inferences, the State would certainly have done so.

The Circuit Court and the Court of Special Appeals also attached a great deal of importance to the facts that a FTA warrant had been issued for Mr. Lewis and that $741.00 was seized from his person. The State, however, presented no evidence whatsoever that there was anything significant about the denominations of the bills seized from Mr. Lewis's person, or about how those bills were folded. Although one of the deputies observed a penknife on the rear floorboard of the vehicle, (1) possession of a penknife is not a crime, and (2) we have never heard it suggested that the presence of a penknife is "consistent" with drug related criminal activity. Moreover, we attach a great deal of importance to the fact that no controlled dangerous substances were seized from Mr. Lewis during the search of his person that was conducted incidental to his arrest.[3]

In the case at bar, Petitioner's automobile was stopped for no reason other than the driver "failed to come to a full and

---

**3.** In *Maryland v. Pringle,* 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), while holding that the discovery of both cocaine (found behind the backseat armrest) and $763 (found in the glove compartment) was sufficient to establish probable cause for the arrest of the front seat passenger in an automobile that had been lawfully stopped and searched, the United States Supreme Court noted that there was probable cause to believe that (1) the three occupants of the vehicle were involved in a "common enterprise," and (2) "[t]he quantity of drugs and cash indicated that likelihood of drug dealing." *Id.* at 373, 124 S.Ct. at 801. Because *Pringle* involved a lawful automobile search that turned up *both* cash and controlled dangerous substances, it is clearly distinguishable from the case at bar.

complete stop" at a stop sign. For the reasons stated above, the fact that the occupants of that automobile were persons whose names are in the "alert system" does not provide *reasonable* articulable suspicion that they are drug users/sellers presently involved in criminal activity. At the time Mr. Lewis was arrested, the deputies knew that (1) no drugs had been seized during the search of Mr. Lewis's person, (2) no "open" warrants justified the arrest of Mr. Austin or of Petitioner, (3) Mr. Austin was driving on a valid driver's license, and (4) the Kia owned by Petitioner's mother had not been reported stolen. From our independent constitutional appraisal of the police conduct at issue, we hold that the deputies did not have *reasonable* articulable suspicion to detain Petitioner pending the arrival of the K–9 unit. Petitioner's motion for suppression should have been granted.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY HARFORD COUNTY.**

HARRELL, BATTAGLIA and BARBERA, JJ., dissent.

BATTAGLIA, J., dissenting, in which HARRELL and BARBERA, JJ., join.

I respectfully dissent.

The majority erroneously holds that the police officers in the present case lacked reasonable, articulable suspicion that the occupants of the vehicle were "drug users/sellers presently involved in criminal activity" and, thus, could not detain the Petitioner, Hayward Henderson, for nine minutes [1] before a K–9 unit arrived and alerted to illegal drugs in the vehicle.

---

1. The majority states in its recitation of facts that "[a]n alternate entry on the CAD report shows Lewis's arrest as taking place at 9:43 p.m." Maj. op. at 129, 5 A.3d at 1074. The majority later asserts, however, that, "[a]s the CAD records make clear, the K–9 unit arrived **twelve** minutes after Mr. Lewis was arrested." *Id.* at 146–47, 5 A.3d at 1084 (emphasis added). No one has disputed that the K–9 unit arrived at 9:52 p.m., *id.* at 132–33, 5 A.3d at 1076 so the independent fact finding of twelve minutes by the majority is unwarranted.

As a result, not only is evidence of drugs, a gun, and other contraband suppressed, but the Court is also telling police officers the following: when an officer performs a valid traffic stop, during which he or she arrests a passenger for a CDS-related offense, discovers a substantial amount of currency in a search of the arrestee and recognizes the driver and other passenger as having histories of CDS use and distribution, that officer must affirmatively tell the other passenger to leave the scene.[2] Not saying anything for a period of nine minutes while the passenger is either in the car or by its side will, as here, result in the suppression of incriminating evidence found in the car. The absurdity of what the Court is telling law enforcement is palpable, and the majority not only fails to consider adequately all of the circumstances the police officers faced at the time of the stop but also appears to conflate the probable cause standard for arrest and the less restrictive standard of reasonable suspicion for investigating possible criminal activity.

In reversing the Court of Special Appeals and the trial court, the majority relies upon the following inferences, which were drawn in favor of Henderson, the **losing party before the Circuit Court, on his motion to suppress:**

(1) "From the absence of any explanation for how a person's name gets into the 'alert' system, it is reasonable to infer that there are persons whose names got into that system on the basis of utterly unreliable hearsay information";

(2) "based upon what was *not* testified to by the State's witnesses, although we have no idea how Deputy Ruszala 'knows' Petitioner, it is reasonable to infer that Petitioner's name did not get into the system because Deputy Ruszala was an eyewitness to Petitioner's (1) admission that he was a drug seller, (2) conviction of a violation of the Maryland

---

**2.** A startling proposition in this case, not only on the facts, but also because the vehicle belonged to the passenger's mother. Henderson's abandonment of his mother's car, even if the police officers had ordered him to leave the scene, was unlikely.

Controlled Dangerous Substances Act, and/or (3) sale of a controlled dangerous substance";

(3) it was "reasonable to infer that on the evening that he stopped Petitioner's vehicle, Deputy Ruszala had not made any observations that indicated that the occupants of that vehicle were engaging in activity consistent with the purchase or sale of controlled dangerous substances";

(4) the State "presented no evidence whatsoever that there was anything significant about the denominations of the bills seized from Mr. Lewis's person, or about how those bills were folded"; and

(5) "we attach a great deal of importance to the fact that no controlled dangerous substances were seized from Mr. Lewis during the search of his person that was conducted incidental to his arrest."

Majority op. at 148–50, 5 A.3d at 1085–86. In drawing these inferences, the majority ignores our standard of review, which requires us to accept first-level factual findings unless clearly erroneous and resolve any doubts or reasonable inferences in favor of the party that prevailed at the hearing, which, in this case, was the State. *See, e.g., State v. Luckett*, 413 Md. 360, 375 n. 3, 993 A.2d 25, 33 n. 3 (2010); *Prioleau v. State*, 411 Md. 629, 638, 984 A.2d 851, 856 (2009); *Jones v. State*, 407 Md. 33, 45, 962 A.2d 393, 399 (2008).

Significantly, the majority also seemingly blends the probable cause standard for arrest with the reasonable, articulable suspicion standard for investigation, two standards which have long been understood as having distinct levels of suspicion that support different degrees of intrusion against persons suspected of crimes. The level of suspicion required for reasonable, articulable suspicion, the standard under which we should be viewing the facts in the light most favorable to the State, the prevailing party, is "considerably less than proof of wrongdoing by a preponderance of the evidence" and is "obviously less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989). Reasonable suspicion "can arise from information that

is less reliable than that required to show probable cause," *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309 (1990), and

> [t]he process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981), *quoted in Cartnail v. State,* 359 Md. 272, 288, 753 A.2d 519, 528 (2000). Reasonable suspicion is a flexible concept, which cannot be "reduced to a rigid analytical framework or a set of specific, bright-line rules." *Ferris v. State,* 355 Md. 356, 385, 735 A.2d 491, 506 (1999), citing *Sokolow,* 490 U.S. at 7, 109 S.Ct. at 1585, 104 L.Ed.2d at 10. The majority has done just that, ignoring the province of police officers to use their knowledge and experience in making reasonable determinations of whether to investigate possible criminal activity, by forcing officers to parse through the facts and make determinations that are better suited for academics.

The majority, in isolating various facts and inferences, fails to "look at the **totality of the circumstances** of [this] case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing" or to allow the "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them" at the time of the investigation. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 750–51, 151 L.Ed.2d 740, 749–50 (2002) (internal citations and quotation marks omitted) (emphasis added). In *Arvizu,* the Court of Appeals for the Ninth Circuit determined that seven of those factors relied upon by the trial court carried little or no weight in a reasonable suspicion analysis.

**154**

*Id.* at 272–73, 122 S.Ct. at 750, 151 L.Ed.2d at 749. The Supreme Court, in reversing, reasoned:

We think that the approach taken by the Court of Appeals here departs sharply from the teachings of these cases. The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the totality of the circumstances, as our cases have understood that phrase. The court appeared to believe that each observation by [the border patrol agent] that was by itself readily susceptible to an innocent explanation was entitled to no weight. *Terry*, however, precludes this sort of divide-and-conquer analysis. The officer in *Terry* observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of acts was perhaps innocent in itself, we held that, taken together, they warranted further investigation.

*Id.* at 274, 122 S.Ct. at 751, 151 L.Ed.2d at 750 (internal citations and quotation marks omitted); *see also Nathan v. State*, 370 Md. 648, 664, 805 A.2d 1086, 1096 (2002) (noting that "courts must not view in isolation factors upon which police officers rely to create reasonable suspicion").

Through its myopic analysis of the facts, the majority also fails to recognize one of the most obvious inferences the police officers could make during the stop in question: that Henderson, Austin, and Lewis were engaged in a common enterprise of drug activity. In *Wyoming v. Houghton*, 526 U.S. 295, 304–05, 119 S.Ct. 1297, 1302, 143 L.Ed.2d 408, 417 (1999), the Supreme Court noted that a "car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." Likewise, in *Maryland v. Pringle*, 540 U.S. 366, 373, 124 S.Ct. 795, 801, 157 L.Ed.2d 769, 777 (2003), "it was reasonable for the officer to infer a common enterprise among the three men [in the vehicle]. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to

admit an innocent person with the potential to furnish evidence against him." [3]

It is obvious that the circumstances of the encounter, as articulated in the trial court's findings, create a reasonable, articulable suspicion that Henderson was involved in a common enterprise of drug activity with the two other occupants of the vehicle:

● While patrolling in the Edgewood Area of Harford County, Maryland, which is a high crime and high drug area, Deputy Ruszala of the Harford County Sheriff's Department Gang Suppression Unit engaged a car in a valid traffic stop at approximately 9:28 p.m.

● Deputy Ruszala recognized two of the car's three occupants, including Henderson, whom he knew as a drug user and seller.

● Deputy Ruszala also recognized the driver, Austin, whom he had arrested for CDS-related charges approximately three weeks before the traffic stop at issue here.

● There was a valid, outstanding arrest warrant for the occupant of the right front passenger seat, Lewis, for failure to appear in a CDS-related case.

● A valid search incident to arrest on Lewis yielded $741 on his person.

● The traffic stop was not complete at the time of Lewis's arrest.

In addition to the suppression court's findings, none of which was found by the majority to be clearly erroneous, the record includes the following facts testified to by Deputy Ruszala, the arresting officer:

---

**3.** Although the majority distinguishes *Maryland v. Pringle* because the facts in that case were allegedly weightier than in the present case, what really distinguishes *Pringle* is that the burden of proof on the State in *Pringle* was higher, i.e., that of probable cause. Unlike what the majority posits, the findings in this case do not need to be as persuasive as that in *Pringle*.

• Deputy Ruszala had personal knowledge that Henderson and Austin were known associates of each other, as Henderson was with Austin when Deputy Ruszala arrested him, three weeks before the traffic stop in question.

• Deputy Ruszala never told Henderson that he could not leave the car, and Henderson never asked to leave the car for the duration of the entire stop.

With all of this in mind, what does the majority suggest that the officers should have done with Henderson after arresting Lewis? As the trial court concluded, a reasonably prudent officer **would not say** to Henderson, "run along and be a good boy, you are obviously not involved in anything here," as the majority would have that officer do.

In essence, the majority would have the officers ignore all personal knowledge they had regarding the criminal history of the vehicle's remaining occupants and dismiss the information they received from the alert system. The majority also would have the officers disregard the $741 found on Lewis, unless they could describe the origami patterns and denominations of money preferred by drug dealers. Most of all, based on the "great deal of importance" the majority places on the lack of drugs found on Lewis, the majority would have the police officers refrain from investigating suspected drug activity, unless they had immediately found drugs, which has never been the standard to evaluate reasonable, articulable suspicion.

The police officers clearly possessed reasonable, articulable suspicion that the occupants of the vehicle were "drug users/sellers presently involved in criminal activity," which supported their detention of Henderson until the arrival of the K–9 unit, some nine minutes after Lewis's arrest. The judgments of the Court of Special Appeals and the Circuit Court for Harford County should be affirmed.

Judges HARRELL and BARBERA have authorized me to state that they join in this opinion.